UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CITIBANK, N.A., AS TRUSTEE FOR THE
BENEFIT OF SWDNSI TRUST SERIES
2010-3,

        Plaintiff,

v.

RENEE ANNA NAJDA a/k/a RENEE
NAJDA, ANDREW NAJDA and any and all
occupants,

        Defendants.

Case No. 14-13593

RENEE ANNA NAJDA a/k/a RENEE
NAJDA, ANDREW NAJDA and any and all
occupants,

        Defendants/Counterclaim Plaintiffs

v.

CITIBANK, N.A., AS TRUSTEE FOR THE
BENEFIT OF SWDNSI TRUST SERIES
2010-3,

        Plaintiff/Counterclaim Defendant,

PENNYMAC, CORP., MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS,
INC., SPECIALIZED LOAN SERVICING,
LLC, PENNYMAC LOAN SERVICES, LLC
and CITIMORTGAGE, INC.

        Counterclaim Defendants.

## ANSWER AND COUNTERCLAIMS

Defendants Renee Anna Najda a/k/a Renee Najda and Andrew Najda (collectively, the

"Najdas") answer the Complaint of Plaintiff Citibank, N.A., as Trustee for the benefit of

SWDNSI Trust Series 2010-3 ("Citibank" or "Plaintiff") (the "Complaint") as follows:

The Najdas deny each and every allegation in Plaintiff's Complaint that is not

specifically admitted, denied or otherwise responded to in this Answer.

## INTRODUCTION

1.    Denied.

## PARTIES

2.    The Najdas are without sufficient information or knowledge to admit or deny the

allegations contained in this paragraph.

3.    The Najdas are without sufficient information or knowledge to admit or deny the

allegations contained in this paragraph.

4.    Admitted.

5.    Admitted.

## JURISDICTION

6.    Paragraph 6 states legal conclusions to which no response is required.

7.    Paragraph 7 states legal conclusions to which no response is required.

## VENUE

8.    Admitted.

## FACTS

9.    Admitted that the Najdas executed an "Interest-Only Period Adjustable Rate

Note" to CitiMortgage in the amount of $3,464,000 on or about August 3, 2007.  The Najdas

deny that Exhibit A is a true and correct copy of the Note.

10.     The Najdas are without sufficient information to either admit or deny whether Exhibit B is a true and correct copy of the Mortgage.  In further responding, the Najdas state that the Mortgage, filed with the Registry of Deeds, contains additional pages not included within Exhibit B, including an Adjustable Rate Assumption Rider, Adjustable Rate Rider and Schedule A.  The Najdas deny the remaining allegations contained in this paragraph.

11.     Exhibit C speaks for itself.  In further responding, the Najdas state that they are without sufficient information to either admit or deny the allegations contained in this paragraph.

12.     Exhibit D speaks for itself.  In further responding, the Najdas admit that PennyMac's purported assignment of the Mortgage to Citibank was ineffective.  The Najdas are without sufficient information to either admit or deny the remaining allegations contained in this paragraph.

13.     Exhibit E speaks for itself.  In further responding, the Najdas state that they are without sufficient information to either admit or deny the allegations contained in this paragraph.

14.     Exhibit F speaks for itself.  In further responding, the Najdas state that Paragraph 14 states legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

15.     Denied.

16.     The first sentence of paragraph 16 states legal conclusions to which no response is required.  To the extent that a response is required, the allegations are denied.  The Najdas are without sufficient information to either admit or deny the remaining allegations contained in this paragraphs.  Further responding, the Najdas deny that Exhibit A is a true and accurate copy of the Note.

17.     Exhibit G speaks for itself.  To the extent a response is required, the allegations of Paragraph 17 are denied.

18.     Exhibit G speaks for itself.  To the extent a response is required, the allegations of Paragraph 18 are denied.

19.     Exhibit H speaks for itself.  To the extent a response is required, the allegations of Paragraph 19 are denied.

20.     Denied.  Further answering, Exhibit G speaks for itself.

21.     Denied.

22.     Paragraph 22 states legal conclusions to which no response is required.  The Najdas deny the remaining allegations contained in this paragraph.

23.     Denied.  Further answering, the Mortgage and Note speak for themselves.

24.     Denied.  Further answering, the Mortgage and Note speak for themselves.

25.     Denied.  Further answering, the Mortgage and Note speak for themselves.

26.     Denied.  Further answering, the Mortgage speaks for itself.

27.     Denied.  Further answering, the Mortgage speaks for itself.

28.     Denied.  Further answering, Exhibit I speaks for itself.

29.     Denied.

## COUNT I
### (Declaratory Judgment)

30.     The Najdas repeat and re-allege the above paragraphs as if fully set forth herein.

31.     Denied.

32.     Paragraph 32 states a request for relief to which no response is required.  To the extent a response is required, the allegations are denied.

4

33.     Paragraph 33 states legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

## COUNT II
### (Breach of Contract)

34.     The Najdas repeat and re-allege the above paragraphs as if fully set forth herein.

35.     Denied.

36.     Denied.  Further answering, the Mortgage and the Note speak for themselves.

37.     Denied.

38.     Denied.

39.     Denied.

40.     Denied.

41.     Paragraph 41 states a request for relief to which no response is required.  To the extent a response is required, the allegations are denied.

42.     Denied.

## COUNT III
### (Servicemembers Civil Relief Act)

43.     The Najdas repeat and re-allege the above paragraphs as if fully set forth herein.

44.     Paragraph 44 states legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

45.     Paragraph 45 states a request for relief to which no response is required.  To the extent a response is required, the allegations are denied.

## COUNT IV
### (Conditional Judgment)

46.     The Najdas repeat and re-allege the above paragraphs as if fully set forth herein.

47.     Denied.

48.      Denied.

49.      Paragraph 49 states legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

50.      Paragraph 50 states a request for relief to which no response is required.  To the extent a response is required, the allegations are denied.

### COUNT V
**(Foreclosure)**

51.      The Najdas repeat and re-allege the above paragraph as if fully set forth herein.

52.      Denied.

53.      Paragraph 53 states a legal conclusion to which no response is required.  To the extent a response is required, the allegations are denied.

54.      Denied.

55.      Denied.

56.      Denied.

57.      Paragraph 57 states a request for relief to which no response is required.  To the extent a response is required, the allegations are denied.

58.      Paragraph 58 states a request for relief to which no response is required.  To the extent a response is required, the allegations are denied.

### COUNT VI
**(Possession)**

59.      The Najdas repeat and re-allege paragraphs 1 through 58 as if fully set forth herein.

60.      Paragraph 60 states a legal conclusion to which no response is required.  To the extent a response is required, the allegations are denied.

61.     Paragraph 61 states a request for relief to which no response is required.  To the extent a response is required, the allegations are denied.

## COUNT VII
### (Unjust Enrichment)

62.     The Najdas repeat and re-allege paragraphs 1 through 61 as if fully set forth herein.

63.     Denied.

64.     Denied.

65.     Denied.

66.     Denied.

The remainder of Plaintiff's Complaint comprises a prayer for relief as to which no response is required.  The Najdas deny that Plaintiff is entitled to an award of any relief at all or the relief sought in paragraphs (1)-(9) as stated in the Complaint against the Najdas.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Plaintiff has failed to state a claim upon which relief may be granted.

### Second Affirmative Defense

Plaintiff's claims are barred under the doctrines of estoppel, laches, waiver and/or unclean hands.

### Third Affirmative Defense

Plaintiff's claims are barred because it has not suffered any damages from the acts and conduct of which it complains.

### Fourth Affirmative Defense

Plaintiff's claims are barred because it failed to mitigate its damages, if any.

**Fifth Affirmative Defense**

Plaintiff's claims are barred because it is not the holder of the Note and Mortgage.

**Sixth Affirmative Defense**

Plaintiff's claims are barred because it failed to comply with M.G.L. ch. 244 §§ 35A, 35B and 35C.

**Seventh Affirmative Defense**

Plaintiff's claims are barred by the conduct and actions of CitiMortgage.

**Eighth Affirmative Defense**

Plaintiff's claims are barred for failure to join a necessary party and/or parties.

**Ninth Affirmative Defense**

Plaintiff's claims are barred due to Plaintiff's bad faith, fraud, misrepresentation and/or violations of law.

**Tenth Affirmative Defense**

The Najdas reserve the right to set forth additional affirmative defenses as they become known during the course of the litigation.

## COUNTERCLAIM

## INTRODUCTION

By this Counterclaim, Renee Najda and Andrew Najda (collectively, the "Najdas") seek to hold CitiMortgage, Inc. ("CitiMortgage") accountable for their breach of a forbearance agreement that was supposed to lift the threat of foreclosure and give the Najdas the opportunity to sell the property, repay the loan, and unlock more than $2 million of accumulated equity in the property. Instead, CitiMortgage accepted the inflated payments it imposed on the Najdas (a monthly *increase* of nearly $1,800), but continued to foreclose anyway. As a result, the Najdas

8

had no chance to sell their home for fair market value. CitiMortgage's breach of the forbearance agreement and subsequent unlawful foreclosure efforts also triggered an avalanche of confused and contradictory assignments that left the Najdas paralyzed as to who to negotiate with and who to pay. The result of CitiMortgage's bad acts is that the Najdas are once again on the brink of losing their home and the millions they invested into the property.

By way of background, the Najdas refinanced their home in August 2007, executing a $3,464,000 note with CitiMortgage and granting a mortgage to Mortgage Electronic Registration Systems, Inc. ("MERS"), as nominee for CitiMortgage. Beginning in early 2009, the Najdas began having difficulty making the mortgage payments. The Najdas reached out to CitiMortgage for assistance several times. Finally, on October 13, 2010, the Najdas and CitiMortgage reached a forbearance agreement, whereby the Najdas agreed to make increased monthly payments (to eliminate amounts past due) and CitiMortgage, in turn, would reinstate the loan and stop foreclosure efforts. This forbearance plan was intended to give the Najdas breathing space to sell the property, repay the loan, and realize the over $2 million that they had in equity.

While the Najdas performed their end of the deal (making the payments and listing the property for sale), CitiMortgage pushed forward with a foreclosure proceeding in Land Court. Not surprisingly, this foreclosure tainted the Najdas' property as "distressed" and caused the value of their home to plummet. As a result of CitiMortgage's misconduct, the Najdas have been unable to sell their property for fair market value and have suffered significant damages.

Between August 2007 and June 2014, moreover, the mortgage and note on the property were repeatedly assigned to various entities (including MERS, PennyMac, Corp. ("PennyMac") and Citibank, N.A. as trustee for the benefit of SWDNSI Trust Series 2010-3 ("Citibank"))

without proper documentation.  Consequently, the true identity of the proper holder of the mortgage and note remains unknown.  Due to the sloppy manner in which the purported assignments were handled, there are serious questions as to whether the Plaintiff here (Citibank) actually holds the note and mortgage on the Najdas' home and can lawfully foreclose.  Making matters worse, the Najdas have received no less than four different versions of the note under which Citibank purports to collect.  As such, the Najdas seek declaratory relief as to: (1) who properly holds the note and mortgage; and (2) the proper amount owed on the debt.  Until this Court determines Citibank to be a proper plaintiff with a cognizable interest in the property, any foreclosure proceedings must cease.

The Najdas are also entitled to compensatory and statutory damages arising from the improper manner in which the attempted foreclosures of the property have been handled. Specifically, CitiMortgage, Citibank, SLS and PLS failed to comply with the obligations imposed by Massachusetts law and certain federal statutes, including the Real Estate Settlement Procedures Act and M.G.L. ch. 244 §§ 35A, 35B and 35C, further harming the Najdas' credit and tainting the Property.  This improper conduct, moreover, constitutes an unfair and deceptive trade practice proscribed by M.G.L. ch. 93A.  As such, the Najdas are entitled to damages due to the Counterclaim Defendants' misconduct.

## PARTIES

1.      Counterclaim Plaintiffs, Renee Anna Najda a/k/a Renee Najda and Andrew Najda (collectively, the "Najdas") are individuals, who reside at 71 Flint Road, Concord, Massachusetts 01742 (the "Property").

2.      Counterclaim Defendant Citibank as Trustee ("Citibank") is a national bank chartered under the National Bank Act with a usual place of business at 399 Park Avenue, New

York, New York 10022.  Upon information and belief, Citibank is the trustee of SWDNSI Trust Series 2010-3, a Delaware Statutory Trust dated December 20, 2010 (the "Trust").

3.     Counterclaim Defendant PennyMac Corporation ("PennyMac") is a Delaware Corporation, with its principal place of business in California.

4.     Counterclaim Defendant Mortgage Electronic Registration Systems, Inc. ("MERS") is a Delaware corporation, with a principal place of business in Virginia.

5.     Counterclaim Defendant Specialized Loan Servicing, LLC ("SLS") is a limited liability company organized under the laws of Delaware with a principal place of business in Highlands Ranch, Colorado.  Upon information and belief, SLS is a wholly owned subsidiary of Specialized Loan Servicing Holdings, LLC ("SLS Holdings"), a limited liability company organized under the laws of Delaware with a principal place of business in Colorado.  Upon information and belief, the sole member of SLS Holdings is Computershare US Services, Inc., which is a Delaware corporation with a principal place of business in Chicago, Illinois.

6.     Counterclaim Defendant PennyMac Loan Services, LLC ("PLS") is a Delaware limited liability corporation, with its principal place of business in California.

7.     Counterclaim Defendant CitiMortgage, Inc. ("CitiMortgage") is a New York corporation, with its principal place of business in O'Fallon, Missouri.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) insofar as all or a substantial portion of the events that give rise to the Najdas' claims transpired in Massachusetts, and the Property is located in Massachusetts.

## FACTS

The Najdas' Home

10.     In May 1995, Renee Najda purchased a parcel of land located at 71 Flint Road, Concord, Massachusetts.  Over the course of the next six years, the Najdas spent approximately $5 million to build a luxury home on the Property.  Since 2005, the Property has been the Najdas' primary residence.

11.     According to the Town of Concord's records, the Property has a tax assessed value of $4,561,700.  The Property, which is comprised of a 9,100 square foot home and 3.5 acres of land, is well-maintained and in excellent condition.

12.     The Najdas reside at the Property with their three children and Mrs. Najda's elderly mother.  The Najdas also operate two start-up financial services companies from their home.

In August 2007, the Najdas Refinance the Property

13.     As of August 2007, the Najdas had a $2,764,129 mortgage on the Property.

14.     On or about August 3, 2007, the Najdas refinanced that mortgage and executed an "Interest-Only Period Adjustable Rate Note" with CitiMortgage in the amount of $3,464,000.00 (the "Note").  Both Andrew and Renee Najda are listed as debtors on the Note.

15.     To secure the Note, Renee Najda granted a mortgage to MERS as nominee for CitiMortgage (the "Mortgage").  The Mortgage was recorded at the Middlesex County (Southern District) Registry of Deeds on August 8, 2007 at book 49913, page 53.

16.     Thus, the original mortgagee was MERS and the original Note holder was CitiMortgage.

17.     At the time of the refinancing, the Property was appraised at $6 million.

18.     Between 2007 and early 2009, the Najdas made all payments due under the Note.

In 2009, the Najdas Request Assistance from CitiMortgage

19.     Beginning in early 2009, as the worldwide recession took hold, the Najdas began having difficulty making their monthly mortgage payments.

20.     As a result, the Najdas approached CitiMortgage and requested various hardship extensions and other assistance.

21.     Despite the Najdas' numerous requests for assistance, CitiMortgage sent a September 1, 2010 notice of default, demanding that the Najdas pay $32,339.91 by October 1, 2010, to cure the deficiencies in their mortgage payments.

22.     In response to the default letter, the Najdas spoke to CitiMortgage representatives who, on two separate occasions (September 19 and 29, 2010), verbally agreed that the Najdas could have a short grace period to pay the $32,339.91 and cure the default.

Despite Agreeing To the Grace Period, CitiMortgage Begins the Foreclosure Process

23.     Despite agreeing to a grace period with respect to the past due balance, CitiMortgage began the process to foreclose on the Property.  Upon information and belief, CitiMortgage changed the status of the loan from delinquent to foreclosure.

24.     CitiMortgage further retained Harmon Law Offices ("Harmon") to foreclose on the Property and began preparing the required foreclosure documents.

The Najdas and CitiMortgage Enter Into a Forbearance Agreement

25.     On October 13, 2010, the Najdas received a letter from CitiMortgage stating that "all efforts to cure the loan failed" and that the loan was being transferred for foreclosure proceedings to legal counsel (Harmon).

26.     That same day (October 13, 2010), the Najdas called CitiMortgage to negotiate a

forbearance plan that would allow the Najdas time to sell the Property, pay back the Note, and recapture their equity, which was estimated to be well over $2 million.

27.     During their two telephone calls that day, the Najdas and CitiMortgage agreed to an 18-month forbearance plan (the "Forbearance Plan").

28.     Specifically, Andrew Najda spoke with Floyd Hanson of CitiMortgage on two separate calls, both of which were electronically recorded by agreement of the parties.

29.     During the calls, the parties agreed that the Najdas would immediately pay CitiMortgage $12,234.45 (the "Initial Payment"), which was comprised of a mortgage payment of $10,793.47 plus $1,441.08 in attorneys' fees already incurred by CitiMortgage.

30.     They further agreed that the remaining delinquent amount (approximately $30,000) would be spread over 18 months, increasing the Najdas' monthly mortgage payment by $1,716.81 to $11,878.06 per month.

31.     CitiMortgage agreed that once the Initial Payment posted, a document reflecting the parties' agreement would be faxed to the Najdas for signature.  And once the Najdas signed and returned that document, CitiMortgage would reinstate the loan and report it as current.

32.     While on the phone with Floyd Hanson, Andrew Najda made the Initial Payment electronically.  Floyd Hanson then confirmed that the Forbearance Plan was in place.

CitiMortgage Breaches the Forbearance Plan

33.     Between October 14 and October 21, 2010, Mr. Najda contacted CitiMortgage several times to request a copy of the document setting forth the agreed upon Forbearance Plan. During these calls, the CitiMortgage representatives informed Mr. Najda that their internal computer system confirmed the existence of an agreement.

34.     On October 21, 2010, CitiMortgage faxed a document to Mr. Najda purporting to

14

set forth the Forbearance Plan.  The document, however, did not give the Najdas credit for their $12,234.45 Initial Payment - - which they made on October 13, 2014.

35.     Mr. Najda immediately signed and returned the document purporting to be the Forbearance Plan to CitiMortgage the next day with the understanding and expectation that the $12,234.45 Initial Payment would be credited against the more than $41,000 delinquency stated on the document and his account would be reinstated as "current."

In Blatant Violation of the Forbearance Plan, CitiMortgage Actively Pursues Foreclosure

36.     The next day, on October 22, 2010, the Najdas received a letter from CitiMortgage's attorney (Harmon), stating that it had been retained by CitiMortgage to foreclose on the Mortgage.  The letter further stated that if the Najdas "notify this office in writing within the thirty-day period . . . that the debt, or any portion thereof, is disputed, . . . this office shall cease collection of this debt . . . ."

37.     On or about October 27, 2010, both the Najdas and their attorney wrote to Harmon that they disputed the debt owed and that CitiMortgage had already agreed to a Forbearance Plan.

38.     Despite representing that it would wait thirty days and cease collection if the debt was disputed (which it was), Harmon immediately filed a foreclosure action on the Property for CitiMortgage.

39.     Specifically, on October 22, 2010, CitiMortgage (through Harmon) filed a Complaint under the Servicemembers Civil Relief Act, docket no. 10 MISC 441991 (the "2010 Foreclosure").  In doing so, CitiMortgage breached the Forbearance Plan.

The 2010 Foreclosure Was Improper Because It Was Based on a False Affidavit

40. Because Massachusetts foreclosures (like the 2010 Foreclosure) typically proceed through a non-judicial process, the accuracy of the foreclosure documents is paramount.

41. As part of the 2010 Foreclosure, however, CitiMortgage submitted an affidavit that it knew to be false.

42. Specifically, CitiMortgage filed a Mortgagee Affidavit signed by its Default Processor, Stephanie Young. That affidavit stated that as of October 7, 2010, CitiMortgage "is the mortgagee of the mortgage" ("2010 Mortgagee Affidavit"). That statement, however, was false *and CitiMortgage knew it.*

43. As of October 7, 2010, MERS was the mortgagee for the Property- - not CitiMortgage. Indeed, MERS did not assign the Mortgage to CitiMortgage until October 13, 2010 - - *six days **after** the 2010 Mortgagee Affidavit was signed.*

44. Despite knowing that the 2010 Mortgagee Affidavit was false, CitiMortgage never corrected or amended it. Instead, it filed that false affidavit as part of the 2010 Foreclosure.

45. Because the 2010 Foreclosure was based on a false Mortgagee's Affidavit, the 2010 Foreclosure was improper.

The Najdas Perform Under the Forbearance Plan While CitiMortgage Breaches

46. For the next twelve months following the Forbearance Plan, the Najdas made timely payments under the Forbearance Plan.

47. Additionally, the Najdas promptly hired Coldwell Banker - - a preeminent real estate brokerage firm in Concord - - to list the Property for sale. Based on Coldwell Banker's advice and expertise, the Property was listed for sale for $6.95 million.

48.     The Najdas' efforts to sell the Property, however, were stymied by CitiMortgage's failure to honor the Forbearance Plan.  Specifically, despite agreeing to reinstate the Najdas' account and list it as current (thus removing it from the foreclosure status), CitiMortgage failed to dismiss the 2010 Foreclosure.

49.     Because the loan was in default and a foreclosure was looming, the Property was tainted as "distressed."  This taint drove away legitimate buyers and encouraged low-ball offers.  Indeed, instead of receiving offers for fair market value (*i.e.*, $6.95 million), the Najdas received two low-balls, including one for $3.5 million.

50.     In May and June 2011, the Najdas (through their counsel) reiterated their request for CitiMortgage to dismiss the 2010 Foreclosure.

51.     In May 2011, CitiMortgage (through its counsel) promised to dismiss the 2010 Foreclosure.  Despite that promise, the foreclosure action remained active for another three years - - until 2014.

52.     As a result, the Property remained tainted as distressed and the Najdas were unable to obtain offers for anywhere near fair market value.

53.     The Property remained on the market from 2011 until December 29, 2013 and went through two price reductions - - first to $5.95 million and then to $5.5 million.  Finally, the Najdas' broker (Coldwell Banker) told them that the only way they would ever recover their equity was to delist the Property until the foreclosure issues could be resolved.

A Rat's Nest of Purported Assignments of the Note and Mortgage Complicates the Najdas' Efforts to Sell the Property and Repay the Loan

54.     CitiMortgage's breach of the Forbearance Plan set off a landslide of events that crushed the Najdas' chances of recovering any equity in their home.  What happened after is a mind-bending procession of alleged assignments and another improper foreclosure that left the

17

Najdas paralyzed.

55.     First, on March 24, 2011, the Najdas received notice that "ownership of the loan" had been transferred to PennyMac.  The notice identified PennyMac as the "new creditor."  The notice did not specify whether the Mortgage, Note or both were assigned to PennyMac.  Notably, this was the first time the Najdas ever heard of PennyMac's involvement with the Mortgage and/or Note.

56.     The Najdas never received anything from CitiMortgage regarding this purported transfer, nor was anything filed with the Massachusetts Registry of Deeds.

57.     Notably, in its Complaint in this action, Plaintiff Citibank did not state any allegations relating to this purported assignment to PennyMac.

58.     Next, in April 2011, CitiMortgage (not PennyMac) notified the Najdas that it was transferring the servicing of the Mortgage to SLS.

59.     As described above, because CitiMortgage failed to dismiss the 2010 Foreclosure, the Najdas were impeded in their ability to sell the Property and repay the loan.  As a result, the Najdas again fell behind in their monthly mortgage payments in mid to late 2011.

60.     On January 5, 2012, SLS - - who the Najdas believed was servicing the loan - - sent a Notice of Default and Notice of Intent to Foreclose to the Najdas.  The letter identified SLS as the "current creditor to whom the debt is owed."  At this point in time, however, the Najdas had been advised that PennyMac owned the Note and/or the Mortgage and that SLS was just the servicer.  By identifying itself as the "current creditor," this letter further complicated the question of who held the Note and Mortgage.

61.     Five days later, on January 10, 2012, SLS sent another letter to the Najdas.  This time, SLS identified itself as the "servicer to Citibank."  This was the first mention ever about

Citibank's role in this matter.  Moreover, there was no representation as to what, if anything, Citibank purported to hold.

62.     Months later, on August 27, 2012, PennyMac attempted (for the first time) to assign the Mortgage and Note to Citibank, as trustee for the benefit of SWDNSI Trust Series 2010-3.  This assignment was not recorded with the Massachusetts Registry of Deeds until October 25, 2012.

63.     Upon information and belief - - including without limitation documents filed with the Massachusetts Registry of Deeds and information provided to the Najdas - - PennyMac may not have held the Note and the Mortgage as of August 27, 2012.  Accordingly, this assignment to Citibank is questionable.

64.     Compounding the confusion, a month later, on September 18, 2012, CitiMortgage purported to assign (for the first time) the Mortgage (but not the Note) to PennyMac.  This assignment was recorded in the Registry of Deeds on October 9, 2012.  Given the August 2012 assignment from PennyMac to Citibank, there is a question as to the validity of the purported September 2012 assignment from CitiMortgage to PennyMac.

<u>Citibank Begins a Second Foreclosure on the Property, Despite Not Holding the Mortgage</u>

65.     On May 7, 2013, SLS mailed the Notice of Right to Cure pursuant to M.G.L. ch. 244 § 35A.  In this letter, SLS identified Citibank as the mortgagee.  Upon information and belief, and based upon the spurious August and September 2012 assignments, there is valid dispute as to whether Citibank was the mortgagee and whether the representation in the Notice was accurate.

66.     In response to the Notice of Right to Cure letter, the Najdas sought to modify the mortgage with SLS on June 5, 2013.

67.     Despite the Najdas' request for a modification, on June 17, 2013, Citibank (through its "attorney-in-fact" SLS) began another foreclosure process - - even though the 2010 Foreclosure was still pending in Land Court.  In connection with the second foreclosure, a second Mortgagee's Affidavit stated that Citibank was now the mortgagee.

68.     Upon information and belief, Citibank was not the holder of the Mortgage as of June 17, 2013.  Indeed, according to the September 18, 2012 assignment (described above), PennyMac was the mortgagee of record.

69.     On June 19, 2013, two days after Citibank began the foreclosure process, SLS denied the Najdas' request for modification and failed to provide a copy of the assessment required by M.G.L. ch. 244 § 35B.

70.     In their denial letter, SLS stated that the "required/requested documents have either not been submitted in the time frame allowed or are outdated."

71.     SLS also informed the Najdas that they had the "right to request . . . a second independent review."  SLS also stated that if the Najdas request such a review, they would not "initiate or continue with foreclosure during the review process."

72.     On July 12, 2013, the Najdas requested a second independent review for a loan modification and also a reduction in their mortgage payment.

73.     On October 18, 2013, despite the Najdas' requests for a loan modification, Citibank filed a complaint under the Servicemembers Civil Relief Act, docket no. 13 MIS 480118 (the "2013 Foreclosure"), representing that it was "[a]cting on behalf of the person(s) or entity(ies) currently holding the subject Mortgage and the note."

74.     The 2013 Foreclosure included the second Mortgagee's Affidavit, which stated that Citibank was the mortgagee.  Again, this statement was false because according to the most

recent (September 18, 2012) assignment filed with the Massachusetts Registry of Deeds, PennyMac - - not Citibank - - was the mortgagee.

75.     Because the 2013 Foreclosure was based on a false Mortgagee's Affidavit, it was improper.

The Najdas are Provided Multiple Versions of the Note

76.     As a result of the numerous contradictory purported assignments, the Najdas were completely confused as to who actually owned the Note and Mortgage on their Property.

77.     Under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605(e), a borrower can send a qualified written request to a mortgage servicer for information about their account or to correct account errors.  The servicer is required to acknowledge receipt within five business days and to provide a substantive response within thirty business days.

78.     In late 2013 and continuing into 2014, the Najdas began sending "qualified written requests" to SLS, CitiMortgage and others, seeking information concerning their Mortgage and Note.  In total, more than ten different requests were sent.

79.     SLS acknowledged and responded to some of these "qualified written requests" but not all of them - - indeed, SLS failed to respond to the July 22, 2014 request.  In addition, SLS's responses were inconsistent and raised serious question as to the actual ownership of the Note and Mortgage.

80.     For example, on December 12, 2013, Korde & Associates, P.C. ("Korde") sent a letter on behalf of SLS and Citibank, asserting that Citibank was the holder of the Mortgage and the Note.  But as described above, Citibank was *not* the holder of the Mortgage (or the Note) as of December 12, 2013.

81.     Korde's letter also attached a copy of the Note, which appears to be either false or

incomplete.  Indeed, the Note attached to the letter contained one allonge.  In stark contrast, the Note attached as Exhibit A to the Complaint in this action contains two allonges.

82.    On March 2, 2014 (in response to a different qualified written request), Korde provided another copy of the purported Note to the Najdas.  This copy included a page that states "pay to the order of / without recourse / Ameriquest Mortgage Company" and contains two signatures.  Upon information and belief, Ameriquest Mortgage Company had no involvement with the Najdas' loan.  This version of the Note differs from the version provided on December 12, 2013 and the version attached as Exhibit A to Citibank's Complaint.

83.    On March 11, 2014, CitiMortgage's attorney (Harmon) sent a letter to the Najdas and attached yet another version of the Note.  The March 11, 2014 version of the Note did not include any allonges; however, CitiMortgage represented it to be the "true and accurate copy."

The Mortgage Is Assigned to Citibank in June 2014, Despite Prior Representations That Citibank was Already the Mortgagee

84.    According to documents filed with the Massachusetts Registry of Deeds, PennyMac purportedly assigned the Mortgage to Citibank, as trustee for the Trust on June 24, 2014.

85.    Upon information and belief, the purpose of this assignment was an attempt to correct prior misrepresentations made by Citibank, SLS or their agents regarding Citibank's standing to bring the 2013 Foreclosure.

86.    Although PennyMac purported to assign the Mortgage to Citibank, it did not purport to assign the Note.  Accordingly, it appears that CitiMortgage - - not the named Plaintiff - - holds the Note.

87.    On August 1, 2014, the servicing of the Mortgage loan was transferred from SLS to PLS.

88.     Beginning on August 11, 2014, PLS sent the Najdas communications attempting to collect on the Mortgage, identifying the Trust as the owner of the debt.

<u>The Fair Market Value of the Property</u>

89.     When the Najdas first refinanced the Property in 2007, the appraised value of the Property was $6 million.

90.     As a result of the 2010 and 2013 Foreclosures and the ongoing attempts to foreclose on the Property, the value of the Property has plummeted.

91.     Indeed, as described above, the Najdas' real estate broker has advised them that the only way to restore the Property to fair market value (and recapture their rightful equity in the Property) is to remove the taint of foreclosure that has been looming over the Property since CitiMortgage breached the Forbearance Plan in 2010.

92.     Counterclaim Defendants' improper foreclosures and unauthorized assignments have tainted the Property as "distressed."  That taint, in turn, dissuaded legitimate buyers and encouraged low-ball offers (*i.e.*, people seeking to capitalize on what appeared to be a desperate seller).  As a result, the resale value of the property plummeted well below fair market value (which had since recovered from the 2009-2012 recession).

93.     Indeed, the foreclosure proceedings were advertised in the local newspapers and on certain websites and, therefore, is generally known amongst the public, local brokers and potential buyers.

94.     Despite having an estimated value of $6 million, the Najdas' broker was unable to sell the Property given the foreclosure proceedings.  Indeed, the only offers received on the Property were for half its fair value.

<u>COUNT I</u>
**(Declaratory Judgment against All Counterclaim Defendants)**

95.     The Najdas repeat, re-allege and incorporate by reference the allegations contained in the above paragraphs.

96.     Upon information and belief, the August 27, 2012 and June 24, 2014 purported assignments to Citibank were invalid, ineffective or void.  Where Citibank does not hold the Mortgage and Note at the time of foreclosure, and thus lacks the power to foreclose, the foreclosure is void as invalid.  As such, Citibank does not have the right to foreclose on the Property where, at the time of the Complaint, Citibank does not hold the Mortgage or Note.

97.     Upon information and belief, neither Citibank and/or PLS are proper noteholders and are not entitled to payment under the Note.  Moreover, given the actions by the Counterclaim Defendants in this matter, the Najdas dispute the amount allegedly owed under the Note.

98.     M.G.L. ch. 244 § 35A requires the right-to-cure notice properly identify the mortgagee.  Here, however, the May 7, 2013 right-to-cure notice identifies Citibank as the current mortgage holder.  As set forth herein, Citibank does not hold a proper and valid assignment of the Mortgage.  As such, adequate notice was not provided under M.G.L. ch. 244 § 35A.  Moreover, Citibank and SLS failed to provide the requested and required mortgage modification assessment pursuant to the Najdas' request before foreclosure proceedings were instituted under M.G.L. ch. 244 § 35B.  In addition, given the questions as to whether Citibank holds the Note, Citibank may not have complied with the requirements of M.G.L. ch. 244 § 35C.  Therefore, Citibank is not entitled to proceed with the foreclosure.

99.     The allegations made by the Najdas establish a real and present controversy exists as to the respective rights of the parties in this matter.

100.     Accordingly, the Najdas seek a determination from the Court as to the rights and

obligations of the various parties hereto.  In particular, the Najdas seek this Court to order and/or determine:

       a.   Whether Citibank is the current holder of the Najdas' Note and Mortgage entitling it to foreclose;

       b.   The amount currently due on the loan and the entity to which this amount is owed; and

       c.   Whether Citibank and/or SLS complied with M.G.L. ch. 244 §§ 35A, 35B and 35C, entitling Citibank to proceed with the 2013 Foreclosure or this Action.

## <u>COUNT II</u>
### (Slander of Title against Citibank and CitiMortgage)

101.    The Najdas repeat, re-allege and incorporate by reference the allegations contained in the above paragraphs.

102.    Citibank and CitiMortgage have disparaged the Najdas' valid title by and through the preparing, posting, publishing, filing and recording of documents, including but not limited to, the 2010 Mortgagee's Affidavit, the 2010 Foreclosure, the 2013 Mortgagee's Affidavit, the 2013 Foreclosure and the present litigation.

103.    Citibank and CitiMortgage knew that such documents were false.  As such, these documents denied, disparaged and otherwise cast doubt on the Najdas' legal title to the Property.

104.    By posting, publishing and recording said documents, Citibank's and CitiMortgage's disparagement of the Najdas' legal title was made to the world at large.

105.    Citibank and CitiMortgage published such documents with the intent to injure the Najdas and deprive them of their exclusive right, title, and interest in the Property.

106.    As a direct and proximate result of the publication of such documents, the Najdas' title to the Property has been disparaged and slandered, and there is a cloud on the Najdas' title, and the Najdas have suffered, and continue to suffer, damages in an amount to be proved at trial.

## COUNT III
### (Breach of Contract against CitiMortgage)

107.    The Najdas repeat, re-allege and incorporate by reference the allegations contained in the above paragraphs.

108.    As detailed above, CitiMortgage entered a Forbearance Plan with Mr. Najda, which was a valid, binding and enforceable agreement.

109.    At all times, the Najdas were able and willing to perform their part of the agreement and, but for CitiMortgage's breach, would have fully performed.

110.    As set forth above, CitiMortgage breached its agreement with the Najdas, by, among other things, refusing to dismiss the 2010 Foreclosure.

111.    As a direct and proximate result of CitiMortgage's breach of the Forbearance Plan, the Najdas suffered damages and continue to suffer damages in an amount to be proven at trial, plus interest, costs, attorneys' fees and further consequential damages.

## COUNT IV
### (Breach of the Implied Covenant of Good Faith and Fair Dealing against CitiMortgage)

112.    The Najdas repeat, re-allege and incorporate by reference the allegations contained in the above paragraphs.

113.    CitiMortgage acted intentionally to deprive the Najdas of the fruits of the agreement.

114.    CitiMortgage's conduct included, without limitation, the intentional refusal to comply with the terms set forth in the Forbearance Plan by refusing to dismiss the 2010 Foreclosure.  Such conduct was intended to prevent the Najdas from complying with the terms of the Forbearance Plan.

115.    By its conduct, CitiMortgage breached the implied covenant of good faith and fair

dealing contained in its agreement with the Najdas.

116.    As a direct and proximate result, the Najdas suffered damages and continue to suffer damages in an amount to be proven at trial, plus interest, costs, attorneys' fees and further consequential damages.

## COUNT V
### (Promissory Estoppel against CitiMortgage)

117.    The Najdas repeat, re-allege and incorporate by reference the allegations contained in the above paragraphs.

118.    On October 13, 2010, CitiMortgage represented to the Najdas that the Forbearance Plan was approved and that the Najdas could make modified payments that would satisfy the existing loan obligations for the terms set forth in the Forbearance Plan.

119.    CitiMortgage intentionally induced the Najdas to rely on its representation concerning the Forbearance Plan and to make the modified payments.  The Najdas' detrimental reliance included, without limitation, making the Initial Payment, not seeking other financing for the Property, and making the increased monthly payments for twelve months.

120.    The Najdas' detrimental reliance was reasonable in light of CitiMortgage's representations.

121.    As a result, the Najdas have suffered damages in an amount to be proven at trial, plus interest, costs, attorneys' fees and further consequential damages.

## COUNT VI
### (Negligent Misrepresentation against CitiMortgage)

122.    The Najdas repeat, re-allege and incorporate by reference the allegations contained in the above paragraphs.

123.    In connection with the Forbearance Plan, CitiMortgage represented that it would

27

change the status of the loan back to current and dismiss the 2010 Foreclosure.

124.    As set forth above, CitiMortgage's statements were material and false when made.

125.    CitiMortgage made the false statements described herein for the purpose of inducing the Najdas to rely on them.

126.    The Najdas in fact relied on CitiMortgage's false material statements as true and acted on them to their detriment.  Such detrimental reliance included, without limitation, making the Initial Payment, not seeking other financing for the Property, and making the increased monthly payments for twelve months.

127.    As a direct and proximate result of these misrepresentations, the Najdas have suffered damages.

<u>**COUNT VII**</u>
**(Unjust Enrichment against CitiMortgage)**

128.    The Najdas repeat, re-allege and incorporate by reference the allegations contained in the above paragraphs.

129.    The Najdas conferred benefits upon CitiMortgage through the payments made on or around October 13, 2010 and thereafter, pursuant to the Forbearance Plan.

130.    CitiMortgage was aware of the payments that the Najdas provided.

131.    CitiMortgage's retention of the payments paid under the circumstances described above is inequitable and all payments made to CitiMortgage should be disgorged.

132.    As a result, the Najdas have suffered damages in an amount to be proven at trial, plus interest, costs, attorneys' fees and further consequential damages.

## COUNT VIII
### (Violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 Against CitiMortgage, Citibank, SLS and PLS)

133.    The Najdas repeat, re-allege and incorporate by reference the allegations contained in the above paragraphs.

134.    The Najdas are "consumers" as defined in the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692a(3).

135.    Counterclaim Defendants CitiMortgage, Citibank, SLS and PLS are "debt collectors" and/or "creditors" as defined in the FDCPA, 15 U.S.C. § 1692a(4), (6).

136.    Counterclaim Defendants CitiMortgage, Citibank, SLS and PLS have engaged in debt collection activity because they were attempting to collect on the loan.

137.    Counterclaim Defendants CitiMortgage, Citibank, SLS and PLS used false, deceptive and misleading representations in their attempts to collect "debts owed" because they have identified that that CitiMortgage and/or Citibank was the holder of the Mortgage.  Upon information and belief, CitiMortgage and/or Citibank were not the holder of the Mortgage at the time these representations were made.

138.    Therefore, Counterclaim Defendants CitiMortgage, Citibank, SLS and PLS violated the FDCPA and clouded title to the Najdas' Property.

139.    As a direct and proximate result of Counterclaim Defendants CitiMortgage, Citibank, SLS and PLS, the Najdas have suffered damages as described herein, including a diminution in value of the Property.  The Najdas are therefore entitled to damages in an amount to be proven at trial, including but not limited to the loss in equity and diminution of value of the Property.

## COUNT IX
### (Violation of Real Estate Settlement Procedures Act, 12 U.S.C. § 2605 against SLS)

140.    The Najdas repeat, re-allege and incorporate by reference the allegations contained in the above paragraphs.

141.    Counterclaim Defendant SLS is the servicer of a federal mortgage loan within the meaning of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605.

142.    Counterclaim Defendant SLS deliberately failed and refused to adequately respond to valid "qualified written requests" sent to it pursuant to 12 U.S.C. § 2605(e) by the Najdas, including, without limitation, by utterly failing to respond to the July 22, 2014 "qualified written request."

143.    Counterclaim Defendant SLS' actions as described herein represent violation(s) of RESPA.

144.    As a result of Counterclaim Defendant SLS' violation of RESPA, the Najdas have suffered actual damages, including but not limited to devastation to their reputation and credit rating, monetary damages, and the potential foreclosure of the Property, in an amount to be proven at trial, plus statutory damages, attorneys' fees and costs.

## COUNT X
### (Violation of M.G.L. ch. 93A, §§ 2 & 9 against all Counterclaim Defendants)

145.    The Najdas repeat, re-allege and incorporate by reference the allegations contained in the above paragraphs.

146.    At all relevant times hereto, the Counterclaim Defendants were engaged in trade or commerce in the Commonwealth.

147.    As detailed herein, the Counterclaim Defendants engaged in unfair and deceptive conduct including but not limited to unfair debt collection practices, including making false

statements to the Najdas while attempting to collect a debt, instituting foreclosure proceedings without standing to do so, and failing to dismiss the 2010 Foreclosure despite reaching an agreement with the Najdas to do so.

148.     The unfair and deceptive conduct of the Counterclaim Defendants was knowing and willful.

149.     The unfair and deceptive actions occurred primarily and substantially within the Commonwealth.

150.     On February 1, 2014 and March 27, 2014, the Najdas sent demand letters pursuant to M.G.L. ch. 93A, to which the Counterclaim Defendants failed to make reasonable settlement offers.

151.     As a result, the Najdas are entitled to actual or consequential damages (doubled or trebled because conduct of the Counterclaim Defendants was willful and knowing) in an amount to be proven at trial, plus interest, costs, and attorneys' fees.

## <u>REQUESTS FOR RELIEF</u>

WHEREFORE, the Najdas respectfully request that the Court:

A.     Under Count I:

1.     Declare whether Citibank is the current holder of the Note and Mortgage, entitling it to foreclose on the Property;

2.     Declare the amount currently due on the loan and the entity to which this amount is owed;

3.     Declare whether Citibank and SLS complied with M.G.L. ch. 244 §§ 35A, 35B and 35C;

B.     Under Counts II through X, enter judgment in favor of the Najdas in an amount to be

determined at trial;

C.     Award prejudgment interest, costs and reasonable attorneys' fees; and

D.     Award such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The Najdas demand a jury trial on all issues so triable.

Respectfully submitted,

RENEE ANNA NAJDA A/K/A RENEE NAJDA
AND ANDREW NAJDA,

By their attorneys,

/s/ Dana A. Zakarian
Michael Paris (BBO #556791)
mparis@nbparis.com
Dana A. Zakarian (BBO #641058)
dzakarian@nbparis.com
NYSTROM BECKMAN & PARIS LLP
One Marina Park Drive, 15th Floor
Boston, Massachusetts 02210
(617) 778-9100
DATED: December 15, 2014            (617) 778-9110 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2014 a true copy of the foregoing will be served via the ECF system on all counsel of record, and that any counsel not receiving electronic notifications via the ECF system will be served via first class U.S. mail postage prepaid.

/s/ Dana A. Zakarian
Dana A. Zakarian