# EXHIBIT T

# FIRM BROCHURE
## (Part 2A of Form ADV)

**March 25, 2016**

# PNMAC Capital Management, LLC
3043 Townsgate Road, Ste. 360
Westlake Village, CA 91361
Phone: (818) 224-7050
Fax: (818) 337-2138

**Part 2A of Form ADV (the "Brochure") provides information about the qualifications and business practices of PNMAC Capital Management, LLC.  If you have any questions about the contents of this Brochure, please contact us at (818) 224-7050. The  information in this Brochure has not been approved or verified by the United States  Securities and Exchange Commission or by any state securities authority.**

**PNMAC Capital Management, LLC is registered as an investment adviser with the Securities and Exchange Commission; however, such registration does not imply a certain level of skill or training and no inference to the contrary should be made.**

**Additional information about PNMAC Capital Management, LLC and our investment adviser representatives is also available on the SEC's website at www.adviserinfo.sec.gov.**

PNMAC Capital Management, LLC
Form ADV Part 2A

## ITEM 1: COVER PAGE

Please refer to previous page.

## ITEM 2: MATERIAL CHANGES

### Summary of Material Changes

This Brochure dated March 25, 2016 amends the previous Brochure dated June 1, 2015. The following is a summary of the Material Changes since the last annual amendment of the Brochure dated March 30, 2015:

In Item 1, PNMAC Capital Management, LLC's address and phone number were updated.

In Item 4, the Regulatory Assets Under Management have been updated to $232,930,632, which reflects the amounts as of December 31, 2015.

In Item 9, the Disciplinary Information Section has been updated to reflect that for certain of the cases described in this Item, the U.S. Court of Appeals for the Ninth Circuit has not yet set a date to hear oral arguments.

The *American Fidelity Assurance Company v. Countrywide Financial Corporation, et al.* case, which was brought against Stanford L. Kurland, Chief Executive Officer and Director of PNMAC Capital Management and David A. Spector, Executive Managing Director and Chief Investment Officer and Director of PNMAC Capital Management, in connection with their prior employment, was settled without payment or admission of liability by either Messrs. Kurland or Spector. Therefore, it was removed from Item 9.

In Item 12, the description of brokerage practices has been updated to reflect that PNMAC Capital Management, LLC no longer allocates loan purchases among its clients.

Pursuant to SEC Rules, PNMAC Capital Management, LLC, within 120 days after its fiscal year end of December 31, will ensure that clients receive either a Brochure along with a Summary of Material Changes, or a Summary of Material Changes accompanied by an offer to provide a full copy of this Brochure. To the extent that the firm experiences material changes in the future, clients will receive the Summary of Material Changes with a copy of this Brochure, or the Summary of Material Changes accompanied by an offer to provide a full copy of this Brochure.

2

**PNMAC Capital Management, LLC**
**Form ADV Part 2A**

## ITEM 3: TABLE OF CONTENTS

**Item Number** **Page**

ITEM 1: COVER PAGE ..................................................................................................1

ITEM 2: MATERIAL CHANGES.................................................................................. 2

ITEM 3: TABLE OF CONTENTS................................................................................. 3

ITEM 4: ADVISORY BUSINESS ................................................................................. 4

ITEM 5: FEES AND COMPENSATION ....................................................................... 5

ITEM 6: PERFORMANCE-BASED FEES AND SIDE-BY-SIDE MANAGEMENT.................................. 7

ITEM 7: TYPES OF CLIENTS...................................................................................... 7

ITEM 8: METHODS OF ANALYSIS, INVESTMENT STRATEGIES AND RISK OF LOSS........................ 8

ITEM 9: DISCIPLINARY INFORMATION................................................................. 10

ITEM 10: OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS.................................. 12

ITEM 11: CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND

PERSONAL TRADING ............................................................................. 13

ITEM 12: BROKERAGE PRACTICES ....................................................................... 14

ITEM 13: REVIEW OF ACCOUNTS.......................................................................... 14

ITEM 14: CLIENT REFERRALS AND OTHER COMPENSATION ......................................... 15

ITEM 15: CUSTODY .................................................................................................. 15

ITEM 16: INVESTMENT DISCRETION ................................................................... 16

ITEM 17: VOTING CLIENT SECURITIES................................................................ 16

ITEM 18: FINANCIAL INFORMATION .................................................................... 17

**PNMAC Capital Management, LLC**
**Form ADV Part 2A**

## Item 4: Advisory Business

### *Description of Firm*

PNMAC Capital Management, LLC (the "Adviser") is a limited liability company organized in accordance with the Delaware Limited Liability Company Act, and provides investment advisory services to affiliated funds including two closed end registered investment companies ("RICs"), a closed end private fund ("Private Fund"), a Cayman Islands exempted company (collectively the "Funds"), and a publicly traded REIT ("Public REIT"). The Adviser has been in business since May, 2008.

The Adviser specializes in acquiring and managing residential mortgage-related assets, including distressed mortgage-related assets that are sold by financial institutions including banks, thrifts, and non-bank mortgage lenders.

### *Principal Owners*

PNMAC Capital Management, LLC's principal owner is Private National Mortgage Acceptance Company, LLC ("PennyMac"). PennyMac's principal owners are HC Partners LLC, PennyMac Financial Services, Inc. (a public company) and PennyMac senior management, which each own between 25% but less than 50%. No one in PennyMac's senior management owns more than 25% of PennyMac.

### *Types of Advisory Services Offered*

The Adviser specializes in managing mortgage-related assets, including residential nonperforming and underperforming loans and mortgage-backed securities. The Adviser's affiliate, PennyMac Loan Services, LLC, services most of the residential mortgage loans and real estate owned that are held as investments in the Funds and the Public REIT.

The Adviser has sole investment discretion for the clients it manages with respect to their respective assets and makes all decisions affecting each client's assets in accordance with the client's stated objective and policies as outlined in its offering documents. The Adviser selects investments for its clients and places purchase and sale orders for investments on behalf of such entities. Please refer to Item 8 for further information on our methods of analysis and investment strategies, including details on the specific risks associated with these strategies.

The Adviser makes members of its staff available to its clients to answer questions, provide additional information, or aid them as is permissible. The Adviser also issues a monthly report to its clients on business activity in the mortgage finance industry, with data and graphs, commentary, news items, and other pertinent items.

4

**PNMAC Capital Management, LLC**
**Form ADV Part 2A**

## Advisory Agreements

The Adviser has entered into separate investment management agreements with each of its clients.

## Amount of Client Assets Managed

Regulatory assets under management as of December 31, 2015 are as follows:

| Type of Account | Regulatory Assets Under Management |
|---|---|
| Discretionary | $232,930,632 |
| Non-Discretionary | $-0- |
| Total: | $ 232,930,632 |

## ITEM 5: FEES AND COMPENSATION

*The following chart summarizes the fees and compensation to the Adviser (and the Adviser's General Partner Affiliate):*

| Type of Fee | Payable to | Public REIT | RIC | Private Fund |
|---|---|---|---|---|
| Management Fee | Adviser | Base management fee equal to 1.50% per annum, calculated quarterly, in arrears, of the Public REIT's Shareholders' Equity. | Management fee paid in arrears in an amount equal to an annualized rate of 1.50% of the lower of aggregate Capital Contributions or the Fund's NAV. | Management fee paid in arrears in an amount equal to an annualized rate of 2.00% of the lower of the aggregate Capital Contributions or the Fund's NAV. |
| Incentive Fee/Carried Interest | Adviser and Adviser's Affiliate | The performance incentive fee is calculated at 20% per year of the amount by which core earnings, on a rolling four-quarter basis and before the incentive fee, exceeds an 8% hurdle rate as described more fully in the Investment Management Agreement which is filed as an exhibit to the Public REIT client's Form S-11 which was filed with the SEC on May 22, 2009. | Adviser's affiliate will receive a Carried Interest equal to approximately 20% of the RIC's profits as described in the section of the PPM entitled "Summary of Principal Terms—Distributions". See Item 8 for offering document information. | Adviser will receive a Carried Interest equal to approximately 20% of the Private Fund's profits as described in the section of the PPM entitled "Summary of Principal Terms—Distributions". See Item 8 for offering document information. |
| Shareholder Services Fee | Adviser | Not applicable. | Fee paid in arrears in an amount equal to an annualized rate of 0.5% of the lower of aggregate Capital Contributions or the Fund's NAV. | Not applicable. |

**PNMAC Capital Management, LLC**
**Form ADV Part 2A**

| Termination Fee | Adviser | The termination fee, payable for (1) the Public REIT's termination of the management agreement without cause or (2) Adviser's termination of the management agreement upon a default in the performance of any material term of the management agreement, will be equal to three times (a) the average annual base management fee and (b) the average annual (or, if the period is less than 24 months, annualized) incentive fee earned by Adviser during the prior 24-month period before termination. | Not applicable. | Not applicable. |
|---|---|---|---|---|

All advisory fees are negotiated with the client and are paid in arrears. Fees from the RIC and the Private Funds are deducted quarterly from client's accounts by the client's custodian and paid directly to the Adviser.

Clients maintain agreements with third parties for administration, custody, transfer agency and fund accounting services, and the clients pay for these certain services in addition to the advisory fees. Clients also maintain agreements with an affiliated loan servicer to provide loan servicing for generally all of the loans owned by the clients, which costs are in addition to the advisory and administrative services.

An affiliated client, PNMAC Mortgage Opportunity (Offshore) Fund, LTD, invests all of its assets in PNMAC Mortgage Opportunity Fund, LLC and does not pay a separate management or shareholder fee to the Adviser. Additional information regarding this client may be found in Item 10: Other Financial Industry Activities and Affiliations.

The Adviser, in its advisory capacity, may also earn cash and non-cash advisory compensation for assisting in or providing valuation services related to the securitization of mortgage pools.

Certain expenses are paid by the Adviser and are reimbursed by clients as follows:

*Public REIT*

The Public REIT pays all operating expenses, except those specifically required to be borne by the Adviser under the management agreement. Expenses actually incurred by the Adviser that are reasonably necessary for the performance by the Adviser of its duties and functions under the management agreement are reimbursable. Expenses not reimbursable to the Adviser include salaries and other compensation of its personnel. Certain other costs and expenses incurred by the Adviser and its affiliates in any quarter are reimbursable by the Public REIT subject to a cap. In addition, the Public REIT is required to pay pro rata portion of rent, telephone, utilities, office furniture, equipment, machinery and other office, internal and overhead expenses of the Adviser and its affiliates required for our operations. These expenses are allocated based on the ratio of the proportion of gross assets compared to all remaining gross assets

managed by the Adviser as calculated at each quarter end.  The Public REIT and the Adviser shall modify this allocation methodology, subject to board of trustees' approval if the allocation becomes inequitable.

*Funds*

The Funds will be responsible for paying the compensation of the Adviser, due diligence, negotiation and broken deal expenses, fees and expenses of custodians, administrators, transfer and distribution agents, counsel and directors, insurance, filings and registrations, proxy expenses, expenses of communications to investors, interest, taxes, portfolio transaction expenses, indemnification, litigation and other extraordinary expenses and such other expenses as the Adviser is not obligated to provide (such as services the Adviser is required to supervise, review or coordinate) and as are approved by the directors as being reasonably related to the organization, offering, capitalization, operation, regulatory compliance or administration of the Company and any portfolio investments. Expenses associated with the general overhead of the Adviser will not be covered by the Funds. Funds will bear the costs and expenses of the Adviser pursuant to agreement, which may not be amended without the Adviser's written consent.  Adviser may advance payment of any such fees and expenses and the Fund is obligated to reimburse the Adviser within 30 days following written request.

## ITEM 6: PERFORMANCE-BASED FEES AND SIDE-BY-SIDE MANAGEMENT

Performance-based fees are in the form of Incentive Compensation/Carried Interest, and are outlined in the table above.

The Adviser provides investment advisory services to affiliated funds including two closed end registered investment companies, a closed end private fund, an Offshore fund and a publicly traded REIT, and therefore may encounter potential conflicts of interest. Two of the Adviser's investment representatives are investors in the Private Fund. However, as a fiduciary, the Adviser strives to allocate all investment opportunities among its clients on a fair and equitable basis and in accordance with each client's stated investment objectives and restrictions. In addition, the Adviser's Chief Compliance Officer will perform periodic reviews of the investment allocations to the Funds and the REIT, to help ensure allocations remain fair and equitable.

## ITEM 7: TYPES OF CLIENTS

### Description

The Adviser focuses on affiliated clients that invest in mortgage related assets. The affiliated clients consist of two closed end registered investment companies, a closed end private fund, a Cayman Islands exempted company and a publicly traded REIT.

PNMAC Mortgage Opportunity Fund, LLC, invests substantially all of its assets in a limited partnership interest of PNMAC Mortgage Opportunity Fund, L.P. (the "Master Fund"), a limited partnership formed under the laws of the state of Delaware. The Master Fund operates as a

7

master fund in a master-feeder fund structure. The Master Fund acts as a central investment mechanism for PNMAC Mortgage Opportunity Fund, LLC, and PNMAC Opportunity Fund Associates, LLC, the General Partner of the Master Fund. The General Partner of the Master Fund has the exclusive right to conduct the operations of the Master Fund. PNMAC Mortgage Opportunity Fund, LLC held a 99.99% ownership interest in the Master Fund at December 31, 2011, 2010, and 2009. At December 31, 2012, December 31, 2013, December 31, 2014, and December 15, 2015, PNMAC Mortgage Opportunity Fund held a 91.8%, 89%, 85%, and 67% ownership of the Master Fund, respectively. PNMAC Mortgage Opportunity Fund, LLC is the sole limited partner in the Master Fund. Please see Item 10 for additional information on the affiliations of the Funds.

Currently the Adviser only provides services to affiliates and does not generally offer services to the public.

### *Conditions for Managing Accounts*

The Adviser does not impose any specific conditions for managing accounts; however, the Adviser focuses on its affiliated funds and does not generally offer its services to the public.

## ITEM 8: METHODS OF ANALYSIS, INVESTMENT STRATEGIES AND RISK OF LOSS

### *Methods of Analysis*

The Adviser's investment objective is to generate attractive risk adjusted return to our clients over the long term, according to each client's stated investment objective and policies. The Adviser utilizes proprietary analytical and portfolio management expertise and technology to review potential investments of residential whole loans and mortgage backed securities. The investment analysis review process involves reviewing loan collateral characteristics, aggregate loan portfolio profiles, cash flow analysis, and structure of investment acquisition.

### *Investment Strategies*

The investment strategy deployed targets specific niche areas in the residential mortgage sector that fit both the weighted average life and yield profile of a client's portfolio requirement.

### *Risk of Loss*

Investing in mortgage loans and mortgage related assets is risky and could result in loss. Clients should be aware of the risks and be prepared to bear any such loss.

Clients' investment activities expose them to the various types of risk, which are associated with the financial instruments and markets in which they invest.

PNMAC Capital Management, LLC
Form ADV Part 2A

Investments in mortgage-backed securities and mortgage loans have exposure to certain degrees of risk, including interest rate, market risk, and the potential non-payment of principal and interest, including default or bankruptcy of the issuer or the intermediary in the case of a participation. Mortgage loans are subject to prepayment risk, which will affect the maturity of such investments.

Investments in real estate acquired in settlement of loans are subject to various risk factors. Generally, real estate investments could be adversely affected by a recession or general economic downturn where the properties are located as well as the availability of similar properties in the immediate area. Real estate investment performance is also subject to the success that a particular property manager has in managing the property.

Clients are indirectly subject to interest rate risk. Interest rate risk is the risk that investment in loans held by the mortgage investments will decline in value because of changes in market interest rates. Investments in mortgage loans with long-term maturities may experience significant price declines if long-term interest rates increase.

Market risk represents the potential loss in value of financial instruments caused by movements in market factors including, but not limited to, market liquidity, investor sentiment, interest and foreign exchange rates. Client's portfolios include certain investments that are generally illiquid and have a greater amount of market risk than more liquid investments. These investments may trade in limited markets or have restrictions on resale or transfer and may not be able to be liquidated on demand if needed. The value assigned to these investments may differ significantly from the values that would have been used had a ready market existed and such differences could be material to the financial statements.

Adverse changes in economic conditions are more likely to lead to a weakened capacity of borrowers to make principal payments and interest payments. An economic downturn could severely affect the ability of highly leveraged borrowers to service their debt obligations or to repay their obligations. Under adverse market or economic conditions, the secondary market could contract further as well, increasing the illiquid nature of the loans. As a result, the Funds or the Public REIT could find it more difficult to sell loans or may be able to sell only at prices lower than if such investments were widely traded.

An investment in the Funds or the Public REIT is subject to investment risk, including the possible loss of the entire principal invested. An investment in the Funds or the Public REIT represents an indirect investment in the loans held by the mortgage companies. The value, like other market investments, may move up or down, sometimes rapidly and unpredictably. An investment in the Funds or the Public REIT at any point in time may be worth less than the original investment. Investment values can fluctuate for several reasons including the general condition of the mortgage market or when political or economic events affecting the issuers occur.

As part of its investment strategy, the Funds or the Public REIT may utilize borrowings. Client investments may also use borrowings in the ordinary course of their operations. The use of borrowings may materially affect the operations of the clients or their investments and thus its ultimate value. Financing may not always be available on acceptable terms, in the necessary amounts, or for the period needed. This could have a material negative impact on the performance

of the Funds or the Public REIT. The Public REIT may invest in mortgage-related derivatives, including, but not limited to, options, futures and derivatives on mortgage-backed securities. The prices of derivative instruments, including futures and options, are highly volatile. Options and futures are also subject to the risk of the failure of any of the exchanges on which positions trade or of our clearinghouses or counterparties. Option transactions may be part of a hedging strategy (*i.e.,* offsetting the risk involved in another securities position) or a form of leverage, in which the holder will have the right to benefit from price movements in a large number of securities with a small commitment of capital. These activities involve risks that can be substantial, depending on the circumstances.

The Funds clear substantially all of their investment purchases and sales and maintain substantially all of their investments and cash positions at the third party administrator and custodian. Credit risk is measured by the loss the Funds would record if administrator failed to perform pursuant to terms of their obligations.

Due to the nature of the master fund/feeder fund structure, the master fund could be materially affected by subscription or redemption activity.

Additional risks and risk factors are stated in each client's offering documents or Form 10-K:

- o PNMAC Mortgage Opportunity Fund, LLC Confidential Private Placement Memorandum Amended and Restated as of September 30, 2008
- o PNMAC Mortgage Opportunity Fund Investors, LLC Confidential Private Placement Memorandum Amended and Restated as of September 30, 2008
- o PNMAC Mortgage Opportunity (Offshore) Fund, LTD. (a Cayman Islands Exempted Company) Offshore Wrapper to the Confidential Private Placement Memorandum of PNMAC Mortgage Opportunity Fund, LLC July, 2008
- o PennyMac Mortgage Investment Trust's most recent Annual Report on Form 10-K

The Adviser does not represent, guarantee or imply that the services or methods of analysis employed by us can or will predict future results, successfully identify market tops or bottoms, or insulate clients from losses due to market corrections or declines.

## ITEM 9: DISCIPLINARY INFORMATION

Registered investment advisers are required to disclose all material facts regarding any legal or disciplinary events that would be material to a client's or prospective client's evaluation of an adviser or the integrity of its management. With the exception of the litigation described below, the Adviser does not have any such legal or disciplinary events.

The litigation described below has been brought against Stanford Kurland, Chief Executive Officer and Director of the Adviser, and David Spector, Executive Managing Director and Chief Investment Officer and Director of the Adviser, in connection with their former employment at Countrywide Financial Corporation. The litigation has no connection to the Adviser.

***Luther, et al. v. Countrywide Financial Corporation, et al. (USDC, Central District of California, Case No. 12-cv-5125) (USCA, Ninth Circuit, Case Nos. 14-55121, 14-55125)***

In this case filed on November 14, 2007, the plaintiffs are a class of persons who purchased or otherwise acquired mortgage-backed securities ("MBS") issued by several Countrywide-related entities. The plaintiffs claim the Registration Statements and Prospectus Supplements related to those securities contained material misrepresentations or omissions. The sole claim against Messrs. Kurland and Spector was a claim under Section 11 of the Securities Act of 1933 predicated on Registration Statements that they allegedly signed.

On April 17, 2013, Bank of America, which acquired Countrywide Financial Corporation, reached a consolidated settlement of the *Luther*, *Western Teamsters*, and *Maine State* lawsuits (see below). Under the agreement, Bank of America agreed to a settlement payment of $500 million in exchange for a global release and the dismissal of the lawsuits in their entirety. The Court granted the plaintiffs' motion for final approval of the settlement on December 5, 2013, and entered final judgment and dismissed the case with prejudice in its entirety on December 17, 2013. Neither Messrs. Kurland nor Spector have admitted any liability in connection with the sole claim against them nor have they paid any amounts under the settlement.

On January 15, 2014, the class members who objected to the consolidated settlement filed notices of appeal in all three cases in the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit") challenging the U.S. District Court's final approval of the settlement. The appeals in each case are pending and will be decided together.

On November 24, 2015, the Ninth Circuit set a hearing date on the consolidated appeals for February 3, 2016. The Ninth Circuit took that hearing off calendar, and on January 26, 2016, gave notice that it was considering the May 2016 calendar for oral argument on the consolidated appeals. No oral argument date has been set.

***Maine State Retirement System v. Countrywide Financial Corporation, et al. (USDC, Central District of California, Case No. 10-cv-00302) (USCA, Ninth Circuit, Case Nos. 14-55093, 14-55128, 14-55140)***

In this case filed on January 14, 2010, the plaintiffs are a class who purchased or acquired certain Countrywide MBS. They allege that the Registration Statements and Prospectus Supplements pursuant to which the MBS were offered contained material misrepresentations or omissions. The initial complaint alleged violations of Sections 11, 12 and 15 of the Securities Act in connection with 427 separate MBS offerings. The lead plaintiffs filed an amended complaint on June 6, 2011 and dropped the Section 15 claims against Messrs. Kurland and Spector.

On October 12, 2011, the Court certified the lawsuit as a class action. On April 17, 2013, Bank of America reached a consolidated settlement of the *Luther*, *Western Teamsters*, and *Maine State* lawsuits. Under the agreement, Bank of America agreed to a settlement payment of $500 million in exchange for a global release and the dismissal of the lawsuits in their entirety. The Court granted the plaintiffs' motion for final approval of the settlement on December 5, 2013, and entered a final judgment and dismissed the case with prejudice in its entirety on December 17, 2013. Neither Messrs. Kurland nor Spector have admitted any liability in connection with the sole claim against them nor have they paid any amounts under the settlement.

On January 15, 2014, the class members who objected to the consolidated settlement in filed notices

of appeal in all three cases in the Ninth Circuit, challenging the U.S. District Court's final approval of the settlement. The appeals in each case are pending and will be decided together.

On November 24, 2015, the Ninth Circuit set a hearing date on the consolidated appeals for February 3, 2016.  The Ninth Circuit took that hearing off calendar, and on January 26, 2016, gave notice that it was considering the May 2016 calendar for oral argument on the consolidated appeals. No oral argument date has been set.

***Western Conference of Teamsters Pension Trust Fund v. Countrywide Financial Corporation, et al. (USDC, Central District of California, Case No. 12-cv-5122) (USCA, Ninth Circuit, Case Nos. 14-55120, 14-55122)***

This class action case, filed on November 17, 2010, alleges claims against various Countrywide entities and former executives under the Securities Act on behalf of a class of investors who purchased MBS from various Countrywide entities. The plaintiffs allege that Messrs. Kurland and Spector violated Section 11 of the Securities Act by signing Registration Statements that contained material misstatements or omissions.

On April 17, 2013, Bank of America, which eventually acquired Countrywide Financial Corporation, reached a consolidated settlement of the *Luther*, *Western Teamsters*, and *Maine State* lawsuits. Under the agreement, Bank of America agreed to a settlement payment of $500 million in exchange for a global release and the dismissal of the lawsuits in their entirety.  The Court granted the plaintiffs' motion for final approval of the settlement on December 5, 2013, and entered final judgment and dismissed the case with prejudice in its entirety on December 17, 2013. Neither Messrs. Kurland nor Spector have admitted any liability in connection with the sole claim against them nor have they paid any amounts under the settlement.

On January 15, 2014, the class members who objected to the consolidated settlement and filed notices of appeal in all three cases in the Ninth Circuit, challenging the U.S. District Court's final approval of the settlement.  The appeals in each case are pending and will be decided together.

On November 24, 2015, the Ninth Circuit set a hearing date on the consolidated appeals for February 3, 2016.  The Ninth Circuit took that hearing off calendar, and on January 26, 2016, gave notice that it was considering the May 2016 calendar for oral argument on the consolidated appeals. No oral argument date has been set.

## ITEM 10: OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS

### *Financial Industry Activities*

The Adviser's clients maintain agreements with an affiliated servicer, PennyMac Loan Services, LLC ("PLS"). PLS performs loan servicing for most of the loans owned by the Adviser's clients. Each client acknowledges the use of the affiliated servicer PLS through the execution of Servicing Agreements. PLS earns servicing fees from each investment client for servicing portions of its loan portfolio.

### *Affiliations*

The Adviser is affiliated with the following entities:

PNMAC Capital Management, LLC
Form ADV Part 2A

- PennyMac Loan Services, LLC - the loan servicer, which receives compensation from clients
- PNMAC Loan Services, Inc. – a real estate broker
- PennyMac Mortgage Investment Trust – a client and a public company
- PNMAC Mortgage Opportunity Fund, LLC – a client and a registered investment company
- PNMAC Mortgage Opportunity Fund, LP- a client and a registered investment company, wholly owned by PNMAC Mortgage Opportunity Fund, LLC
- PNMAC Mortgage Opportunity Fund Investors, LLC- a client and an unregistered (a private) fund
- PNMAC Mortgage Opportunity (Offshore) Fund, LTD- a client and a Cayman Islands exempted company that invests in PNMAC Mortgage Opportunity Fund LLC
- PNMAC Opportunity Fund Associates, LLC – the Adviser is the managing member of this limited liability company, which is the general partner of the PNMAC Mortgage Opportunity Fund, LP.

Clients should be aware that there may be certain direct and indirect economic benefits received by the Adviser due to these affiliations, which create conflicts of interest and may indirectly influence the Adviser's choice of investments for clients; however, as a fiduciary to our clients, we endeavor at all times to put the interest of our clients first and the Adviser will make investment decisions for each client that are suitable based on a particular client's investment objectives and policies.

## ITEM 11: CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND PERSONAL TRADING

### *Description of Code of Ethics*

The Adviser's current Code of Ethics is prepared in accordance with applicable federal securities laws. General principles and specific provisions include:

- At all times, the interests of the Adviser's clients must come first;

- Personal security transactions must be conducted consistent with the code in a manner that avoids any actual or potential conflict of interest; No inappropriate advantage should ever be taken of any position of trust and responsibility.

- The Adviser prohibits Access Persons from engaging in any outside business activities or employment that conflict with their job at the Adviser; and

- The Adviser has policies with respect to giving or receiving gifts and entertainment, including reporting of gifts and entertainment over certain de minimus levels.

- The Adviser requires pre-approval for certain political contributions made by "Covered Associates," as well as periodic reporting of political contributions by employees.

The Adviser's affiliate, a loan servicer, may receive compensation or compensation-in-kind as a result of servicing the investment loan portfolio. The Adviser may make investment decisions based on access to the right to service a mortgage loan portfolio. The Adviser will make

13

investment decisions for each client that are suitable, based on a particular client's investment objectives and policies and in accordance with the Adviser's fiduciary duties, irrespective of whether its affiliated loan servicer receives servicing rights.

The Code of Ethics will be provided to any client or prospective client upon request.

The Adviser does not participate in client transactions but may receive compensation or compensation-in-kind relating to the activities of its affiliated loan servicing entity.

## ITEM 12: BROKERAGE PRACTICES

The Adviser may select dealers or brokers to execute the purchases and sales of clients' investments. If any dealers or brokers are used in connection with the purchase or sale of any investments, the Adviser will seek best execution for each transaction that provides the best available price and most favorable execution reasonably obtainable under the circumstances.

Best execution may be measured over time through several transactions rather than a single transaction. Clients generally do not pay commissions on investment transactions as substantially all transaction are on a principal basis with dealers or directly with the sellers which may or may not include a markup or a markdown. The Adviser does not utilize soft dollar arrangements; however, the Adviser may from time to time receive subscriptions to industry publications and conference attendance sponsored by certain brokers.

As the Adviser enters into the purchase of residential mortgages through either a whole loan or securities structure, risk/expected return needs to be allocated to ensure that each fund receives it pro-rata share based on capital available for investment.

The Adviser does not allocate loans among client accounts.

The Adviser does not effect any principal or agency cross securities transactions for client accounts, nor does it effect cross-trades between client accounts. Principal transactions are generally defined as transactions where an adviser or an account in which the Adviser and or its principals and control persons own more than 25% of the account, acting as principal, buys from or sells any security to any advisory client. An agency cross transaction is defined as a transaction where a person acts as an investment adviser in relation to a transaction in which the investment adviser, or any person controlled by or under common control with the investment adviser, acts as broker for both the advisory client and for another person on the other side of the transaction. Should the Adviser ever decide to effect principal trades or cross-trades in client accounts, it will comply with the provisions of Section 206(3) of the Advisers Act and the rules thereunder.

## ITEM 13: REVIEW OF ACCOUNTS

The Adviser reviews client accounts at least monthly by a meeting of the Valuation Committee. The members of the committee include each of the persons providing investment advice and making investment decisions for clients. Those individuals are the Chief Executive Officer, the Chief Investment Officer, the Chief Credit Officer, the Chief Capital Markets Officer and the

Chief Business Development Officer.   The accounts are reviewed for valuation, return and composition. Clients receive a monthly statement as well as a corresponding monthly newsletter providing market color and indices for relevant markets.

## ITEM 14: CLIENT REFERRALS AND OTHER COMPENSATION

The Adviser does not currently have any relationship with any third-party firm or individual whose purpose is marketing and/or gathering assets for us. The Adviser may in the future enter into arrangements for third-party marketing services although none are contemplated at this time. Any and all such arrangements would be disclosed to potential clients and current clients.

The Adviser has affiliations with certain companies that provide services to our clients. Because of such arrangements, the Adviser receives certain direct and indirect compensation. In addition, these relationships create certain conflicts of interest between the Adviser and our clients. Please refer to Item 10 for further information, including how such conflicts are addressed by us.

## ITEM 15: CUSTODY

The Adviser uses a third party custodian and such custodian is responsible for, among other things, fund administration, including fund accounting, investor reporting and serving as the custodian for the fund assets.  The Adviser does not perform custodial services.

The Custodian and the Adviser each send monthly or quarterly statements to Funds. Each Fund should compare the statements from both the Adviser and Custodian, as applicable, to ensure the information and the account values are the same.

Pursuant to Rule 206(4)-2 of the Advisers Act, the Adviser is deemed to have custody of client funds since the Adviser has the authority and ability to debit our fees directly from clients' accounts, and because the Adviser serves as the managing member to the Private Fund. To mitigate any potential conflicts of interests due to this arrangement, all our client account assets are maintained with an independent non-affiliated qualified bank custodian.

As outlined in Rule 206(4)-2 of the Investment Advisers Act of 1940, investment advisers that are deemed to have custody of client assets (other than through the ability to debit fees) are generally required to have an annual independent verification of those assets. The verification must be in the form of a surprise examination performed by an independent non-affiliated certified public accountant. However, an exception applies in the case of private investment funds, so long as the Private Fund is receiving  annual audits of their financial statements performed by an independent public accountant, which is registered with and subject to regular inspection by the Public Company Accounting Oversight Board (PCAOB). In addition, the audited financial statements must be prepared in accordance with Generally Accepted Accounting Principles (GAAP) and distributed to all investors within 120 days of the end of the private fund's fiscal year. The private funds also must receive an audit upon full liquidation and the audited financial statements must be distributed to all of a fund's investors promptly after the completion of such audit.

Currently, the Adviser does not have annual surprise audits performed since the Private Fund client is receiving annual audits of its financial statements by a public accounting firm that is registered with and subject to regular inspection by the PCAOB. We also assist the Private Fund

with the distribution of the audited financial statements to all its investors and ensure such distributions are made within 120 days of the Private Fund's fiscal year end. Should the Private Fund liquidate its assets, we will ensure its financial statements are audited at that time and distributed to investors.

## ITEM 16: INVESTMENT DISCRETION

### *Discretionary Authority; Limitations*

### A. Discretionary Authority; Limitations

The Adviser has been granted discretion, and has the authority to determine the following without consulting with clients first:

(1) the selection and amount of securities to be bought or sold for client accounts;
(2) whether a client's transaction should be combined with those of other clients and traded as a "block";
(3) commission rates and/or transaction cost paid to effect the transactions.

However, such authority may be subject to specified investment objectives, guidelines, and/or conditions imposed by the client. For example, a client may specify that the investment in any particular stock or industry should not exceed specified percentages of the value of their portfolio, or require restrictions and/or prohibitions of transactions in the securities of a specific industry.

### B. Limited Power of Attorney

The Adviser is authorized to exercise full discretionary authority via a limited power of attorney contained in written agreements, executed between the Adviser and our clients. The Adviser is designated as a client's attorney-in-fact with discretionary authority to effect investment transactions in a client's account which authorizes the Adviser to give instructions to third parties in furtherance of such authority.

## ITEM 17: VOTING CLIENT SECURITIES

Proxy Voting Policy

The Adviser has adopted and implemented written policies and procedures that are reasonably designed to ensure that all proxy voting of client securities are always in the best interest of the clients. However, the Adviser's policy for equity securities is to not vote for this class of securities since this class is not an investment target of any client.

It is the Adviser's policy to vote matters relating to mortgage-backed securities by bringing the matter to the investment committee for careful consideration including determining whether there is a material conflict between the Adviser and client or other clients. In all instances proxy voting will be in the best interest of the clients.

In the event of a material conflict the Adviser shall request direction from the client. In the event that a material conflict cannot be addressed by taking client direction the Adviser shall utilize a third party service.

Clients may request a copy of the Adviser's Proxy Voting Policy or information about how the Advisor voted their securities by contacting us at our offices. Such contact information is reflected

**PNMAC Capital Management, LLC**
**Form ADV Part 2A**

on the cover page of this Brochure.

## ITEM 18: FINANCIAL INFORMATION

The Adviser does not require or solicit prepayment of more than $1,200 in fees per client, six months or more in advance and therefore is not required to provide, and has not provided, a balance sheet. We do not have any financial commitments that impair our ability to meet contractual and fiduciary obligations to clients, and have not been the subject of a bankruptcy proceeding.