UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

CITIBANK, N.A., AS TRUSTEE FOR THE
BENEFIT OF SWDNSI TRUST SERIES 2010-3
and CHRISTIANA TRUST, A DIVISION OF
WILMINGTON SAVINGS FUND SOCIETY, FSB,
NOT IN ITS INDIVIDUAL CAPACITY, BUT
SOLELY AS SEPARATE TRUSTEE FOR PMT
NPL FINANCING 2015-1,

       Plaintiffs,

v.

RENEE ANNA NAJDA a/k/a RENEE NAJDA,
ANDREW NAJDA and any and all occupants,

       Defendants,

SANTANDER BANK N.A. f/k/a SOVEREIGN
BANK,

       Party-in-Interest.

Case No. 14-13593-GAO

---

RENEE ANNA NAJDA a/k/a RENEE NAJDA,
ANDREW NAJDA and any and all occupants,

       Defendants/Counterclaim Plaintiffs,

v.

CITIBANK, N.A., AS TRUSTEE FOR THE
BENEFIT OF SWDNSI TRUST SERIES 2010-3,

       Plaintiff/Counterclaim Defendant,

PENNYMAC, CORP., SPECIALIZED LOAN
SERVICING, LLC, PENNYMAC LOAN
SERVICES, LLC and CITIMORTGAGE, INC.

       Counterclaim Defendants.



---

## **MOTION FOR CLARIFICATION ON SUBJECT MATTER JURISDICTION**

## ARGUMENT

### I.    Introduction

Renee and Andrew Najda (collectively, the "Najdas" and "Counterclaim Plaintiffs") respectfully request that the Court clarify whether subject matter jurisdiction did not exist at the commencement of this action because the plaintiff Citibank, N.A., as Trustee for the Benefit of SWDNSI Trust Series 2010-3 ("Citibank 2010 Trustee") was a naked trustee and SWDNSI Trust Series 2010-3 ("SWDNSI 2010"), an unincorporated entity, shared Massachusetts citizenship with the Najdas.

The Najdas brought forward a factual challenge to diversity jurisdiction because Citibank 2010 Trustee was a naked trustee and SWDNSI 2010 shared Massachusetts citizenship with the Najdas when Citibank 2010 Trustee filed its complaint ("Complaint"). See Dkt. No. 1. Accordingly, the Court did not have subject matter jurisdiction under 28 U.S.C. § 1332(a)(1). The Najdas request this clarification because expending additional resources would be wasteful if the Court's decisions were ultimately deemed void.

### II.    Questions

At the commencement of this action on September 9, 2014:

1)  Was Citibank 2010 Trustee a naked trustee?

2)  Did SWDNSI 2010, an unincorporated entity, have Massachusetts citizenship?

3)  Did subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) exist?

### III.    The Court Has Not Addressed the Najdas' Challenge to Jurisdiction

The Court did not address these questions in its March 29, 2017 Opinion and Order. Specifically, the Court has not addressed the merits of the Najdas' challenge to jurisdiction at the start of this action. The Court has not opined that Citibank 2010 Trustee was not a passive trustee.

2

Nor has the Court written that the SWDNSI 2010's citizenship should <u>not</u> apply to the jurisdictional calculus when this action commenced. Lastly, the Court has not found that SWDNSI 2010, an unincorporated statutory trust, does <u>not</u> have Massachusetts citizenship.

### IV.    The Original Plaintiff Pled Subject Matter Jurisdiction Only on the Basis of Diversity Jurisdiction

In its Complaint, Citibank 2010 Trustee pled only <u>one</u> (1) form of subject matter jurisdiction: diversity jurisdiction. See Dkt. No. 1, Complaint ¶¶ 6-7 ("This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).").

### V.    For a Federal Court to Exercise Diversity Jurisdiction the Plaintiff and Defendants Must Be Citizens of Different States

Under 28 U.S.C. § 1332(a)(1), "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between – (1) citizens of different States."

### VI.    The Najdas Have the Right to Challenge Diversity Jurisdiction at Any Time

"The objection that a federal court lacks subject-matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." <u>Arbaugh v. Y & H Corp.</u>, 546 U.S. 500, 506 (2006) (citations omitted). "[S]ubject-matter jurisdiction … can never be forfeited or waived." <u>Id.</u>, citing <u>United States v. Cotton</u>, 535 U.S. 625, 630 (2002).

### VII.    The Najdas Challenge Subject Matter Jurisdiction

On multiple occasions the Najdas raised a challenge to subject-matter jurisdiction, based on diversity jurisdiction, in several motions and oppositions. See Dkt. Nos. 176 at 3-5 (Opposition to PennyMac, Corp.'s Motion for Summary Judgment), 158 at 2-10 (Motion for Reconsideration), 171 at 4-6 (Opposition to Motion to Substitute Party Plaintiff), and 182 at 4-5 (Opposition to Specialized Loan Servicing, LLC's Motion for Summary Judgment).

**VIII.   Since the Najdas Made a Factual Challenge to Jurisdiction, the Burden Is on the
Plaintiff (Citibank 2010 Trustee) to:**

**(1) Prove by a Preponderance of the Evidence that Citibank 2010 Trustee Is More Than a
Naked Trustee for SWDNSI 2010; and**

**(2) Prove by a Preponderance of the Evidence that SWDNSI 2010 Does Not Have
Massachusetts Citizenship**

"Plaintiffs, as the parties invoking the federal courts' jurisdiction, bear the burden of
demonstrating that jurisdiction is proper." Lincoln Benefit Life Co. v. AEI Life, LLC, 13 F. Supp.
3d 415, 419 (D.N.J. 2014), citing DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342 (2006); see
also Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 8 (1st Cir. 2009), citing McNutt v.
Gen. Motors Acceptance Corp. of Indiana, 298 U.S. 178, 189 (1936) ("[T]he plaintiff ultimately
bears the burden of persuading the court that jurisdiction exists."). In response to a facial challenge,
dismissal is appropriate when a complaint's allegations, which are assumed to be true, do not
support a finding of federal subject matter jurisdiction. See Fothergill v. United States, 566 F.3d
248, 251 (1st Cir. 2009).

In § 1332 cases, "[a] party generally meets this burden by proving diversity of citizenship
by a preponderance of the evidence." McCann v. Newman Irrevocable Trust, 458 F.3d 281, 286
(3d Cir. 2006), citing McNutt, 298 U.S. at 189; see also Amoche v. Guar. Trust Life Ins. Co., 556
F.3d 41, 50 (1st Cir. 2009), citing McNutt, 298 U.S. at 189.

Where, as in here, a defendant makes a factual challenge and "contests any of the
jurisdictional allegations as pled by the plaintiff, ... the court then decides the jurisdictional issue
by weighing the evidence." McCann v. Newman Irrevocable Trust, 458 F.3d 281, 290 (3d Cir.
2006), citing Gould Elecs., Inc. v. United States, 220 F.3d 169, 177 (3d Cir. 2000). As explained
below, Citibank 2010 Trustee has not met its burden of "proving diversity of citizenship by a
preponderance of the evidence." McCann, 547 U.S. at 342.

## IX.    Citibank 2010 Trustee Is a Naked Trustee

### A.    Delaware Statutory Trusts Can Have Naked Trustees

The original plaintiff, Citibank 2010 Trustee, is a trustee of SWDNSI 2010, which is a Delaware statutory trust. See Dkt. No. 1, Complaint ¶ 3. A trustee of a Delaware statutory trust can be a naked trustee, without real and substantial control over a trust's assets and litigation because Delaware law allows a statutory trust to assign management decisions to parties other than a trustee. See 12 Del. C. § 3806(b) ("A governing instrument may contain any provision relating to the management of the business and affairs of the statutory trust" and "[m]ay provide for the appointment … [of] other persons who may manage the business and affairs of the statutory trust.").

### B.    Citibank 2010 Trustee Has No Real and Substantial Control Over SWDNSI 2010's Assets

Evidence establishes that Citibank 2010 Trustee does <u>not</u> manage the business and affairs of SWDNSI 2010. Put another way, Citibank 2010 Trustee is nothing more than a "mere conduit" and "naked trustee for [SWDNSI 2010]." See McNutt v. Bland, 43 U.S. 9, 13-14 (1844).

#### Facial Challenge

First, Citibank 2010 Trustee's pleadings are insufficient to establish that the trustee is active and that the trust is diverse. Citibank 2010 Trustee did not plead that it "possesses certain customary powers to hold, manage, and dispose of assets for the benefit of others." Navarro Sav. Ass'n v. Lee, 446 U.S. 458, 464 (1980). Nor did Citibank 2010 Trustee plead that it is an "active trustee[] whose control over the assets held in [its] name[] is real and substantial." Navarro, 446 U.S. at 465. Citibank 2010 Trustee's sole pleading regarding its role as a trustee is that it "commences this action solely in its capacity as trustee for the benefit of SWDNSI Trust Series 2010-3." See Dkt. No. 1, Complaint ¶ 3. Therefore, on its face the Complaint fails to establish

jurisdiction. The Complaint does not allege that Citibank 2010 Trustee is an active trustee and that SWDNSI 2010 is diverse from the Najdas.

A decision from the 2nd Circuit is illustrative of the merits of the Najdas' challenge to jurisdiction. "U.S. Bank [N.A. as Trustee for LSF9 Master Participation Trust] has included no allegations concerning the type of trust at issue here, its degree of control over the trust assets, or, alternatively, the citizenships of the trust's beneficiaries. Compl. The Court is left to speculate as to these facts, and the Complaint thus fails to sufficiently allege the existence of subject matter jurisdiction. Once again, it must be dismissed." U.S. Bank Trust, N.A. v. Monroe, 2017 U.S. Dist. LEXIS 32874, 10-11 (N.D.N.Y. 2017).

"If U.S. Bank [N.A. as Trustee for LSF9 Master Participation Trust] wishes to proceed in federal court, it must, within thirty (30) days, move to amend its Complaint to address the deficiencies identified in this order. [U.S. Bank must provide] ... documentation required to show that U.S. Bank's control over the trust assets is real and substantial." Id. at 11.

"The Court strongly cautions U.S. Bank (and its attorneys, Gross Polowy) against continuing to claim federal jurisdiction in this or other lawsuits if it either lacks an arguable basis for doing so or does not wish to invest the effort required to make its case." Id. at 11-12. "If a case is significant enough to warrant a federal forum, properly pleading and showing jurisdiction is a reasonable price of admission. If not, the courts of New York are perfectly capable of handling a foreclosure action for nonpayment of a mortgage (perhaps even more so than a federal district court)." Id. at 12.

## Factual Challenge

### Citibank 2010 Trustee Does Not Have Real and Substantial Control over the Trust's Assets

Second, evidence establishes that Citibank 2010 Trustee is a naked trustee. Under the pains and penalties of perjury, Citibank 2010 Trustee admitted that it has no real and substantial control

over SWDNSI 2010's assets, the loans. Citibank 2010 Trustee admitted that "it did not make any decisions with respect to Plaintiffs' loan." See Dkt. No. 123-21, Citibank 2010 Trustee's Interrogatory Response Nos. 8 and 11. Citibank 2010 Trustee not only does not make any decisions with respect to the trust's assets, but also "does not [] possess any documents regarding the Najdas' Note and Mortgage." See Dkt. No. 110, Citibank 2010 Trustee Motion at 5. In other words, Citibank 2010 Trustee does not even have documents related to the purchase or sale of the Najdas' note. Citibank 2010 Trustee further confirmed its own passivity when it produced zero (0) documents in response to the Najdas' document requests. See Dkt. No. 152 at 3. Accordingly, Citibank 2010 Trustee is a "mere conduit" because it makes no decisions with respect to the trust's assets and possesses no documentation for the trust's assets. Documentation that an active trustee would be expected to possess during the normal course of managing a statutory trust's assets. Citibank 2010 Trustee does not control SWDNSI 2010's assets.

<u>PNMAC Cap. Mgmt. Is the Trust's Investment Advisor and Controls the Trust's Assets</u>

PNMAC Capital Management, LLC ("PNMAC Cap. Mgmt."), which is a registered investment advisor, controls SWDNSI 2010's assets. PNMAC Cap. Mgmt. is "a Delaware limited liability company registered with the Securities and Exchange Commission ("SEC") as an investment adviser under the Investment Advisers Act of 1940, as amended. [PNMAC Cap. Mgmt.] enters into investment management agreements with entities that invest in residential mortgage loans and related assets." See Exhibit A, PennyMac Financial Services, Inc. SEC Form 10-Q Note 1 at 1 (June 30, 2014).

"Presently, [PNMAC Cap. Mgmt.] has management agreements with PennyMac Mortgage Investment Trust [("PMIT")], a publicly held real estate investment trust." Id. PNMAC Cap. Mgmt. selects the investments and assets for its managed entities, including PMIT and PMIT's subsidiary trust SWDNSI 2010. See Exhibit B, PNMAC Cap. Mgmt. SEC Part 2A of Form ADV

at 4 ("The Adviser selects investments for its clients and places purchase and sale orders for investments on behalf of such entities."), at 12-13 ("The Adviser is affiliated with the following entities: … PennyMac Mortgage Investment Trust – a client and a public company."); see also Exhibit C, PennyMac Mortgage Investment Trust SEC 10-K Annual Report Exhibit 21.1 (2014) ("[The] LIST OF PENNYMAC MORTGAGE INVESTMENT TRUST ENTITIES … [includes] SWDNSI Trust Series 2010-3"). As PMIT and SWDNSI 2010's investment advisor, PNMAC Cap. Mgmt. manages and controls the purchase and sale decisions of the trust.

PNMAC Cap. Mgmt exclusively -- with no input from the trustees -- places the purchase and sale orders for investments held by PMIT and its subsidiary trusts, including SWDNSI 2010. See Exhibit B at 4. PNMAC Cap. Mgmt. maintains real and substantial control over SWDNSI 2010's assets, not Citibank 2010 Trustee.

## C.     Citibank 2010 Trustee Has No Real and Substantial Control Over this Litigation

Filings establish that the trust's investment manager PNMAC Cap. Mgmt. and its parent Private National Mortgage Acceptance Company, LLC ("PNMAC") control the litigation. See Dkt. No. 63, Local Rule 16.1 Certification at 2 ("Eric T. Jorgensen … Assistant General Counsel … [PNMAC]"). PNMAC met with the plaintiff's counsel, not Citibank 2010 Trustee. Since Citibank 2010 Trustee does not "control the litigation," it is a naked trustee. Navarro, 446 U.S. at 465.

## D.     Merely Holding Title to a Trust's Assets Is Insufficient to Establish that a Trustee Is Active

Citibank 2010 Trustee's allegation that it held title to the Loan is insufficient to establish that it is an active trustee. When Navarro is read as a whole it does "not say that a trustee is the real party in interest as long as it holds title to trust assets." U.S. Bank Nat. Ass'n. v. Coop. Dist. of the City of Spanish Fort, 2011 U.S. Dist. LEXIS 112026, 14 (S.D. Ala. 2011).

8

In the 1st Circuit, a trustee's citizenship does not automatically control for diversity purposes. Nor could it, such a holding would contradict Navarro. In McLarnon v. Deutsche Bank Nat'l Trust Co., 2015 U.S. Dist. LEXIS 89840 (D. Mass. 2015) the Court did not examine whether Deutsche Bank was a naked trustee and apply the Navarro test; instead, it assumed that the trustee's citizenship controlled. See McLarnon, 2015 U.S. Dist. LEXIS 89840 at 6-7. Nor did the plaintiff, McLarnon, challenge diversity jurisdiction on the ground that Deutsche Bank was a naked trustee. Therefore, McLarnon should not be used to guide a review of diversity jurisdiction in the present case.

**X.   Citibank 2010 Trustee Has Not Met Its Burden of Establishing Real and Substantial Control over SWDNSI 2010**

Citibank 2010 Trustee has not met its burden under Navarro. There is no evidence on the record to establish that Citibank 2010 Trustee has real and substantial control over the trust's assets. Rather, the evidence above establishes that Citibank 2010 Trustee is a naked trustee.

**XI.   Since Citibank 2010 Trustee Is a Naked Trustee, SWDNSI 2010's Citizenship Should Be Used to Determine Whether Diversity Jurisdiction Existed at the Commencement of this Action**

Since Citibank 2010 Trustee is a naked trustee, the citizenship of the trust, SWDNSI 2010, must be used to determine whether diversity jurisdiction exists. See U.S. Bank v. Coop, 2011 U.S. Dist. LEXIS 112026 at 26-27 (Dismissing complaint on the ground that plaintiff had not established federal jurisdiction.) ("[T]he Court concludes that U.S. Bank is a 'naked trustee' acting as a mere conduit for a remedy flowing to others. U.S. Bank is not a real party in interest; therefore, its citizenship is not binding for diversity purposes, and the citizenship of the certificate holders (the real parties to this controversy) controls.").

## XII.   SWDNSI 2010 Has Massachusetts Citizenship

SWDNSI 2010, which is an unincorporated entity, inherits Massachusetts citizenship from State Street Corporation ("State Street") through PMIT, which is also an unincorporated entity. At the time the action was brought, SWDNSI 2010 had Massachusetts citizenship.

### A.   A Statutory Trust Is a Citizen of Every State in Which Its Members Reside

"We granted certiorari to resolve confusion among the Courts of Appeals regarding the citizenship of unincorporated entities." Americold Realty Trust v. ConAgra Foods, Inc., 136 S. Ct. 1012, 1015 (2016) (citation omitted). "[C]onfusion regarding the citizenship of a trust is understandable and widely shared. See *Emerald Investors Trust* v. *Gaunt Parsippany Partners*, 492 F. 3d 192, 201-206 (CA3 2007) (discussing various approaches among the Circuits)." Americold, 136 S. Ct. at 1016. Addressing the confusion, the Supreme Court "decline[d] an *amicus*' invitation to apply the same rule to an unincorporated entity that applies to a corporation--namely, to consider it a citizen only of its State of establishment and its principal place of business." Id. at 1017, citing Brief for National Association of Real Estate Investment Trusts 11-21. Therefore, Americold rejected the treatment of a statutory trust as a corporation. An unincorporated entity possesses the citizenship of all its members. See Americold, 136 S. Ct. at 1016.

### B.   SWDNSI 2010 Is an Unincorporated Statutory Trust, Which Possesses the Citizenship of All of Its Members

SWDNSI 2010 is a Delaware statutory trust, which has the capacity to sue. See 12 Del. C. § 3804(a) ("A statutory trust may sue and be sued [in its own name]."). As a Delaware statutory trust, SWDNSI 2010 is a type of unincorporated entity. See 12 Del. C. § 3801(g) ("'Statutory trust' means an unincorporated association."). "So long as such an entity is unincorporated, we apply

our 'oft-repeated rule' that it possesses the citizenship of all its members." Americold, 136 S. Ct. at 1016. Therefore, the citizenship of SWDNSI 2010 is every state in which its members reside.

### C.    SWDNSI 2010's Members, i.e. Owners, Possess Massachusetts Citizenship

#### Facial Challenge

As an initial matter, Citibank 2010 Trustee did not plead facts sufficient to establish that SWDNSI 2010's members are completely diverse from the Najdas. See generally Dkt. No. 1, Complaint. Accordingly, with no record of the citizenship of the trust before the Court, Citibank 2010 Trustee neither established diversity between the parties nor subject matter jurisdiction. See Americold, 136 S. Ct. at 1015 ("As there was no record of the citizenship of Americold's shareholders, the court concluded that the parties failed to demonstrate that the plaintiffs were 'citizens of different States' than the defendants." (citations omitted)); see also U.S. Bank Trust, N.A. v. Monroe, 2017 U.S. Dist. LEXIS at 10-11 ("U.S. Bank [N.A. as Trustee for LSF9 Master Participation Trust] has included no allegations concerning … the citizenships of the trust's beneficiaries. Compl. The Court is left to speculate as to these facts, and the Complaint thus fails to sufficiently allege the existence of subject matter jurisdiction.").

#### Factual Challenge

One of SWDNSI 2010's owners is PMIT. See Exhibit C, PennyMac Mortgage Investment Trust SEC 10-K Annual Report Exhibit 21.1 ("[The] LIST OF PENNYMAC MORTGAGE INVESTMENT TRUST ENTITIES … [includes] SWDNSI Trust Series 2010-3 [which is a] Statutory trust [formed in] Delaware."). PMIT is "a 'real estate investment trust' organized under Maryland law." See Americold, 136 S. Ct. at 1015; see also Exhibit D, PMIT Declaration of Trust at 2 ("The Trust is a real estate investment trust."). "In Maryland, a real estate investment trust is an 'unincorporated business trust or association.'" Americold, 136 S. Ct. at 1016, citing Md. Corp. & Assns. Code Ann. § 8-101(c). Therefore, PMIT possesses the citizenship of all its members. Id.

A publically traded real estate investment trust, PMIT has a geographically diverse set of owners and many are likely to have Massachusetts citizenship. When the complaint was filed, State Street, which has a "principal place of business [] in Massachusetts," was one of PMIT's members. First Mortg. Corp. v. State St. Bank & Trust Co., 173 F. Supp. 2d 1167, 1170 (D. Utah 2001); see also Exhibit E, State Street Form 13F and Information Table for Form 13F at 99 of 124 (for calendar quarter ended 9/30/2014) (State Street owns part of "PENNYMAC MORTGAGE INVEST TR [PMIT]."). Accordingly, SWDNSI 2010 inherits Massachusetts citizenship from State Street through PMIT.

### XIII.   Diversity Jurisdiction Did Not Exist at the Time this Action Commenced

#### A.   Citibank 2010 Trustee Was a Naked Trustee and SWDNSI 2010 Had Massachusetts Citizenship

"It has long been the case that 'the jurisdiction of the Court depends upon the state of things at the time of the action brought.'" Grupo Dataflux v. Atlas Global Group, LP, 541 U.S. 567, 570 (2004) (citations omitted). When this action began, Citibank 2010 Trustee was a naked trustee; therefore, the citizenship of SWDNSI 2010 controlled. As of September 9, 2014, both SWDNSI 2010 and the Najdas had Massachusetts citizenship. Accordingly, diversity jurisdiction did not exist at the commencement of this suit.

#### B.   Citibank 2010 Trustee Did Not Present Countervailing Evidence

Though it had ample opportunity to present evidence in response to the Najdas' filings, Citibank 2010 Trustee provided no rebuttal evidence to the Najdas' challenges of subject matter jurisdiction. Citibank 2010 Trustee did not establish through countervailing evidence that it has fired PNMAC Cap. Mgmt. and taken over managing SWDNSI 2010's assets. Nor has Citibank 2010 Trustee listed all of SWDNSI 2010's members and established that none of them share

Massachusetts citizenship with the Najdas. Accordingly, Citibank 2010 Trustee is a naked trustee with no real and substantial control over SWDNSI 2010.

### C.      Citibank 2010 Trustee Selected the Wrong Forum

Citibank 2010 Trustee is a sophisticated entity represented by counsel. Citibank 2010 Trustee should have reviewed the prerequisites for diversity jurisdiction, including assessing the impact of its lack of control over the trust on the jurisdictional calculus, before it began this litigation in a federal forum. Aware that the trust was unincorporated and of its own passivity, Citibank 2010 Trustee should have reviewed whether any of the trust's members had Massachusetts citizenship. Then Citibank 2010 Trustee should have sued in state court.

### D.      Citibank 2010 Trustee Harmed the Najdas

Citibank 2010 Trustee's decision to litigate in the wrong forum has significantly harmed the Najdas, who have expended a great deal of time and monetary resources in response to a lawsuit that belonged in state court.

### E.      Since Subject Matter Jurisdiction Was Lacking at the Start All Claims Should Be Dismissed

Citibank 2010 Trustee's Complaint should be dismissed for lack of subject matter jurisdiction and all ensuing decisions should be deemed void. See U.S. Bank Trust, N.A. v. Dupre, 2016 U.S. Dist. LEXIS 127848, 11-12 (N.D.N.Y. 2016) ("Despite U.S. Bank's argument, ... this Delaware statutory trust seems precisely like the type considered by the Supreme Court in Americold, and U.S. Bank has failed to demonstrate that it is a real party to the controversy that can proceed in its own right and without reference to the citizenship of the trust's beneficiaries, cf. Del. Code Ann. tit. 12, § 3804(a) ("A statutory trust may sue or be sued [in its own name] . . . ."). For all of these reasons, this action must be dismissed for lack of subject matter jurisdiction.").

## XIV.   The Public Interest

There are likely many naked trustees of statutory trusts, which have Massachusetts citizenship and own the debts of Massachusetts consumers, initiating or removing litigation to the United States District Court for the District of Massachusetts. An opinion and order clarifying subject matter jurisdiction for the present fact pattern is likely to be relevant to other lawsuits yet to be filed in this federal forum. Accordingly, a clarification of the questions presented in this motion serves the public interest.

## CONCLUSION

Presently the initial flaw "still burden[s] and run[s] with the case." Caterpillar Inc. v. Lewis, 519 U.S. 61, 70 (1996). At the commencement of this action, Citibank 2010 Trustee was a naked trustee. Since the citizenship of SWDNSI 2010 controlled and SWDNSI 2010 was an unincorporated statutory trust that shared Massachusetts citizenship with the Najdas, diversity jurisdiction did not exist "at the time of the action brought." Grupo Dataflux, 541 U.S. at 570.

A review of the Najdas' challenge to jurisdiction is in the interest of judicial economy, would prevent a possible retrial of their claims and Citibank 2010 Trustee's claims, and is in the public interest. See In re Avandia Mktg., Sales Practices ..., 2017 U.S. Dist. LEXIS 27566, 19 (E.D. Pa. 2017) ("[C]ontinued litigation would waste time and resources by requiring the Court to render decisions that would ultimately be deemed void.").

WHEREFORE, for the reasons set forth herein, Counterclaim Plaintiffs respectfully request that the Court clarify whether subject matter jurisdiction did not exist at the commencement of this action because the plaintiff Citibank 2010 Trustee was a naked trustee and SWDNSI 2010 shared Massachusetts citizenship with the Najdas. Further, Counterclaim Plaintiffs respectfully request that the Court find that at the onset of this action Citibank 2010 Trustee was a naked trustee, SWDNSI 2010 had Massachusetts citizenship, and the Court did not have subject

14

matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) and grant Counterclaim Plaintiffs any and all other relief the Court deems just and proper.

(Signatures Appear on the Next Page)

.

Respectfully submitted,

Andrew Najda, *pro se*
71 Flint Road
Concord, MA 01742

and

Renee Najda, *pro se*
71 Flint Road
Concord, MA 01742

Date: April 6, 2017

## RULE 7.1 CERTIFICATION

On April 5, 2017, I emailed counsel for Citibank 2010 Trustee, Kevin P. Polansky, and counsel for CitiMortgage, Timothy R. DeMarco, in an effort to narrow or resolve the issues raised in this motion. However, the parties were unable to resolve the issues in this motion.

Andrew Najda

16

## **CERTIFICATE OF SERVICE**

I, Andrew Najda, hereby certify that a true copy of the above document was served upon Kevin P. Polansky, the attorney of record for Citibank, N.A., as Trustee for the Benefit of SWDNSI Trust Series 2010-3, PennyMac, Corp., Specialized Loan Servicing, LLC, PennyMac Loan Services, LLC, and Christiana Trust, a division of Wilmington Savings Fund Society, FSB, not in its individual capacity, but solely as separate trustee for PMT NPL Financing 2015-1, and Timothy R. DeMarco, the attorney of record for CitiMortgage, Inc., by USPS mail on April 6, 2017.

Andrew Najda

# EXHIBIT A

XML 78 R7.htm IDEA: XBRL DOCUMENT

| Organization and Basis of Presentation | 6 Months Ended |
|---|---|
| | Jun. 30, 2014 |
| **Organization and Basis of Presentation** | |
| Organization and Basis of Presentation | **Note 1—Organization and Basis of Presentation** |

PennyMac Financial Services, Inc. ("PFSI" or the "Company") was formed as a Delaware corporation on December 31, 2012. Pursuant to a reorganization, the Company became a holding corporation and its primary asset is an equity interest in Private National Mortgage Acceptance Company, LLC ("PennyMac"). The Company is the managing member of PennyMac and operates and controls all of the businesses and affairs of PennyMac subject to the consent rights of other members under certain circumstances and, through PennyMac and its subsidiaries, continues to conduct the business previously conducted by these subsidiaries.

PennyMac is a Delaware limited liability company which, through its subsidiaries, engages in mortgage banking and investment management activities. PennyMac's mortgage banking activities consist of residential loan production (including correspondent production and consumer-direct lending) and loan servicing. PennyMac's investment management activities and a portion of its loan servicing activities are conducted on behalf of investment vehicles that invest in residential mortgage loans and related assets. PennyMac's primary wholly owned subsidiaries are:

- *PNMAC Capital Management, LLC ("PCM")*—a Delaware limited liability company registered with the Securities and Exchange Commission ("SEC") as an investment adviser under the Investment Advisers Act of 1940, as amended. PCM enters into investment management agreements with entities that invest in residential mortgage loans and related assets.

  Presently, PCM has management agreements with PennyMac Mortgage Investment Trust ("PMT"), a publicly held real estate investment trust, and three investment funds: PNMAC Mortgage Opportunity Fund, LLC and PNMAC Mortgage Opportunity Fund, L.P., (the "Master Fund"), both registered under the Investment Company Act of 1940, as amended; and PNMAC Mortgage Opportunity Fund Investors, LLC (collectively, "Investment Funds"). Together, the Investment Funds and PMT are referred to as the "Advised Entities."

- *PennyMac Loan Services, LLC ("PLS")*—a Delaware limited liability company that services portfolios of residential mortgage loans on behalf of non-affiliates or the Advised Entities, originates new prime credit quality residential mortgage loans, and engages in other mortgage banking activities for its own account and the account of PMT.

  PLS is approved as a seller/servicer of mortgage loans by the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") and as an issuer of securities guaranteed by the Government National Mortgage Association ("Ginnie Mae"). PLS is a licensed Federal Housing Administration Nonsupervised Title II Lender with the U.S. Department of Housing and Urban Development ("HUD") and a lender/servicer with the Veterans Administration ("VA") (each an "Agency" and collectively the "Agencies").

- *PNMAC Opportunity Fund Associates, LLC ("PMOFA")*—a Delaware limited liability company and the general partner of the Master Fund. PMOFA is entitled to incentive fees representing allocations of profits ("Carried Interest") from the Master Fund.

*Initial Public Offering and Recapitalization*

On May 14, 2013, PFSI completed an initial public offering ("IPO") in which it sold approximately 12.8 million shares of its Class A common stock, at a public offering price of $18.00 per share. PFSI received net proceeds of $216.8 million, after deducting underwriting discounts and commissions, from sales of its shares in the IPO. PFSI used these net proceeds to purchase approximately 12.8 million Class A units of PennyMac. PFSI operates and controls all of the business and affairs and consolidates the financial results of PennyMac and its subsidiaries.

The purchase of 12.8 million Class A units of PennyMac has been accounted for as a transfer of interests under common control. Accordingly, the accompanying consolidated financial statements reflect a reclassification of members' equity to noncontrolling interests in the Company of $315.5 million. This amount represents the carrying value in the Company of the existing owners of PennyMac on the date of the IPO.

Before the IPO, PennyMac completed a reorganization by amending its limited liability company agreement to convert all classes of ownership interests held by its existing owners to a single class of common units. The conversion of existing interests was based on the various interests' liquidation priorities as specified in PennyMac's prior limited liability company agreement. In connection with that reorganization, PFSI became the sole managing member of PennyMac.

After the completion of the recapitalization and reorganization transactions, PennyMac became a consolidated subsidiary of the Company. Accordingly, PennyMac's consolidated financial statements are the Company's historical financial statements. The historical consolidated financial statements of PennyMac are reflected herein based on the historical ownership interests of the then-existing PennyMac unitholders.

*Tax Receivable Agreement*

As part of the IPO, PFSI entered into an Exchange Agreement with PennyMac's existing unitholders whereby the existing unitholders may exchange their PennyMac units for PFSI stock. PennyMac has made an election pursuant to Section 754 of the Internal Revenue Code which remains in effect. As a result of this election an exchange under the Exchange Agreement results in a special adjustment for PFSI that may increase PFSI's tax basis of certain assets of PennyMac that otherwise would not have been available. These increases in tax basis may reduce the amount of income tax that PFSI would otherwise be required to pay in the future. These increases in tax basis may also decrease gains (or increase losses) on future dispositions of certain assets to the extent a portion of the increased tax basis is allocated to those assets.

As part of the IPO, PFSI entered into a tax receivable agreement with PennyMac's existing unitholders that will provide for the payment by PFSI to PennyMac exchanged unitholders an amount equal to 85% of the amount of the benefits, if any, that PFSI is deemed to realize as a result of (i) increases in tax basis resulting from the exchanges noted above and (ii) certain other tax benefits related to PFSI entering into the tax receivable agreement, including tax benefits attributable to payments under the tax receivable agreement.

The term of the tax receivable agreement will continue until all such tax benefits have been utilized or expired, unless PFSI exercises its right to terminate the tax receivable agreement. In the event of termination of the tax receivable agreement, the Company would be required to make an immediate payment equal to the present value of the anticipated future net tax benefits, which upfront payment may be made years in advance of the actual realization of such future benefits.

*Basis of Presentation*

The accompanying consolidated financial statements have been prepared in compliance

with accounting principles generally accepted in the United States ("U.S. GAAP") as codified in the Financial Accounting Standards Board's *Accounting Standards Codification* for interim financial information and with the SEC's instructions to Form 10-Q and Rule 10-01 of Regulation S-X. Accordingly, these financial statements and notes do not include all of the information required by U.S. GAAP for complete financial statements. The interim consolidated information should be read together with the Company's Annual Report on Form 10-K for the year ended December 31, 2013. Intercompany accounts and transactions have been eliminated.

The accompanying unaudited consolidated financial statements reflect all normal recurring adjustments necessary to present fairly the financial position, results of operations, and cash flows for the interim periods, but are not necessarily indicative of the results of operations to be anticipated for the full year ending December 31, 2014.

### *Reclassification of previously presented balances*

Certain prior period amounts have been reclassified to conform to the current presentation. Specifically:

· *Interest expense* is included in *Interest income* as a new caption of *Net interest (expense) income* to better reflect results of the Company's portfolio of interest-earning assets. Previously, *Interest expense* was included within *Total expenses*. The reclassification results in the presentation of *Net interest (expense) income*.

Following is a summary of the reclassifications:

| | Quarter ended June 30, 2013 | | | Six months ended June 30, 2013 | | |
|---|---|---|---|---|---|---|
| | As reported | As previously reported | Reclassification | As reported | As previously reported | Reclassification |
| | | | (in thousands) | | | |
| Net interest (expense) income : | | | | | | |
| Interest income | $ 4,474 | $ 4,474 | $ — | $ 6,217 | $ 6,217 | — |
| Interest expense | 4,200 | — | 4,200 | 7,530 | — | 7,530 |
| | $ 274 | $ 4,474 | $ (4,200) | $ (1,313) | $ 6,217 | $ (7,530) |

# EXHIBIT B

# FIRM BROCHURE
## (Part 2A of Form ADV)

**March 25, 2016**

# PNMAC Capital Management, LLC
3043 Townsgate Road, Ste. 360
Westlake Village, CA 91361
Phone: (818) 224-7050
Fax: (818) 337-2138

Part 2A of Form ADV (the "Brochure") provides information about the qualifications and business practices of PNMAC Capital Management, LLC.  If you have any questions about the contents of this Brochure, please contact us at (818) 224-7050. The  information in this Brochure has not been approved or verified by the United States  Securities and Exchange Commission or by any state securities authority.

PNMAC Capital Management, LLC is registered as an investment adviser with the Securities and Exchange Commission; however, such registration does not imply a certain level of skill or training and no inference to the contrary should be made.

Additional information about PNMAC Capital Management, LLC and our investment adviser representatives is also available on the SEC's website at www.adviserinfo.sec.gov.

PNMAC Capital Management, LLC
Form ADV Part 2A

## ITEM 1: COVER PAGE

Please refer to previous page.

## ITEM 2: MATERIAL CHANGES

### Summary of Material Changes

This Brochure dated March 25, 2016 amends the previous Brochure dated June 1, 2015. The following is a summary of the Material Changes since the last annual amendment of the Brochure dated March 30, 2015:

In Item 1, PNMAC Capital Management, LLC's address and phone number were updated.

In Item 4, the Regulatory Assets Under Management have been updated to $232,930,632, which reflects the amounts as of December 31, 2015.

In Item 9, the Disciplinary Information Section has been updated to reflect that for certain of the cases described in this Item, the U.S. Court of Appeals for the Ninth Circuit has not yet set a date to hear oral arguments.

The *American Fidelity Assurance Company v. Countrywide Financial Corporation, et al.* case, which was brought against Stanford L. Kurland, Chief Executive Officer and Director of PNMAC Capital Management and David A. Spector, Executive Managing Director and Chief Investment Officer and Director of PNMAC Capital Management, in connection with their prior employment, was settled without payment or admission of liability by either Messrs. Kurland or Spector. Therefore, it was removed from Item 9.

In Item 12, the description of brokerage practices has been updated to reflect that PNMAC Capital Management, LLC no longer allocates loan purchases among its clients.

Pursuant to SEC Rules, PNMAC Capital Management, LLC, within 120 days after its fiscal year end of December 31, will ensure that clients receive either a Brochure along with a Summary of Material Changes, or a Summary of Material Changes accompanied by an offer to provide a full copy of this Brochure. To the extent that the firm experiences material changes in the future, clients will receive the Summary of Material Changes with a copy of this Brochure, or the Summary of Material Changes accompanied by an offer to provide a full copy of this Brochure.

2

PNMAC Capital Management, LLC
Form ADV Part 2A

## ITEM 3: TABLE OF CONTENTS

__Item Number__                                                                      __Page__

ITEM 1: COVER PAGE ............................................................................................... 1

ITEM 2: MATERIAL CHANGES ................................................................................... 2

ITEM 3: TABLE OF CONTENTS ................................................................................. 3

ITEM 4: ADVISORY BUSINESS ................................................................................... 4

ITEM 5: FEES AND COMPENSATION ........................................................................ 5

ITEM 6: PERFORMANCE-BASED FEES AND SIDE-BY-SIDE MANAGEMENT ...................... 7

ITEM 7: TYPES OF CLIENTS ....................................................................................... 7

ITEM 8: METHODS OF ANALYSIS, INVESTMENT STRATEGIES AND RISK OF LOSS......... 8

ITEM 9: DISCIPLINARY INFORMATION .................................................................... 10

ITEM 10: OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS.................... 12

ITEM 11: CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND

        PERSONAL TRADING ................................................................................. 13

ITEM 12: BROKERAGE PRACTICES ......................................................................... 14

ITEM 13: REVIEW OF ACCOUNTS ........................................................................... 14

ITEM 14: CLIENT REFERRALS AND OTHER COMPENSATION ................................... 15

ITEM 15: CUSTODY ................................................................................................. 15

ITEM 16: INVESTMENT DISCRETION ...................................................................... 16

ITEM 17: VOTING CLIENT SECURITIES.................................................................... 16

ITEM 18: FINANCIAL INFORMATION ....................................................................... 17

PNMAC Capital Management, LLC
Form ADV Part 2A

# Item 4: Advisory Business

## *Description of Firm*

PNMAC Capital Management, LLC (the "Adviser") is a limited liability company organized in accordance with the Delaware Limited Liability Company Act, and provides investment advisory services to affiliated funds including two closed end registered investment companies ("RICs"), a closed end private fund ("Private Fund"), a Cayman Islands exempted company (collectively the "Funds"), and a publicly traded REIT ("Public REIT"). The Adviser has been in business since May, 2008.

The Adviser specializes in acquiring and managing residential mortgage-related assets, including distressed mortgage-related assets that are sold by financial institutions including banks, thrifts, and  non-bank mortgage lenders.

## *Principal Owners*

PNMAC Capital Management, LLC's principal owner is Private National Mortgage Acceptance Company, LLC ("PennyMac"). PennyMac's principal owners are HC Partners LLC, PennyMac Financial Services, Inc. (a public company) and PennyMac senior management, which each own between 25% but less than 50%. No one in PennyMac's senior management owns more than 25% of PennyMac.

## *Types of Advisory Services Offered*

The Adviser specializes in managing mortgage-related assets, including residential nonperforming and underperforming loans and mortgage-backed securities. The Adviser's affiliate, PennyMac Loan Services, LLC, services most of the residential mortgage loans and real estate owned that are held as investments in the Funds and the Public REIT.

The Adviser has sole investment discretion for the clients it manages with respect to their respective assets and makes all decisions affecting each client's assets in accordance with the client's stated objective and policies as outlined in its offering documents. The Adviser selects investments for its clients and places purchase and sale orders for investments on behalf of such entities. Please refer to Item 8 for further information on our methods of analysis and investment strategies, including details on the specific risks associated with these strategies.

The Adviser makes  members of its staff available to its clients to answer questions, provide additional information, or aid them as is permissible. The Adviser also issues a monthly report to its clients on business activity in the mortgage finance industry, with data and graphs, commentary, news items, and other pertinent items.

4

PNMAC Capital Management, LLC
Form ADV Part 2A

### *Advisory Agreements*

The Adviser has entered into separate investment management agreements with each of its clients.

### *Amount of Client Assets Managed*

Regulatory assets under management as of December 31, 2015 are as follows:

| Type of Account | Regulatory Assets Under Management |
|---|---|
| Discretionary | $232,930,632 |
| Non-Discretionary | $-0- |
| Total: | $ 232,930,632 |

## ITEM 5: FEES AND COMPENSATION

*The following chart summarizes the fees and compensation to the Adviser (and the Adviser's General Partner Affiliate):*

| Type of Fee | Payable to | Public REIT | RIC | Private Fund |
|---|---|---|---|---|
| Management Fee | Adviser | Base management fee equal to 1.50% per annum, calculated quarterly, in arrears, of the Public REIT's Shareholders' Equity. | Management fee paid in arrears in an amount equal to an annualized rate of 1.50% of the lower of aggregate Capital Contributions or the Fund's NAV. | Management fee paid in arrears in an amount equal to an annualized rate of 2.00% of the lower of the aggregate Capital Contributions or the Fund's NAV. |
| Incentive Fee/Carried Interest | Adviser and Adviser's Affiliate | The performance incentive fee is calculated at 20% per year of the amount by which core earnings, on a rolling four-quarter basis and before the incentive fee, exceeds an 8% hurdle rate as described more fully in the Investment Management Agreement which is filed as an exhibit to the Public REIT client's Form S-11 which was filed with the SEC on May 22, 2009. | Adviser's affiliate will receive a Carried Interest equal to approximately 20% of the RIC's profits as described in the section of the PPM entitled "Summary of Principal Terms—Distributions". See Item 8 for offering document information. | Adviser will receive a Carried Interest equal to approximately 20% of the Private Fund's profits as described in the section of the PPM entitled "Summary of Principal Terms—Distributions". See Item 8 for offering document information. |
| Shareholder Services Fee | Adviser | Not applicable. | Fee paid in arrears in an amount equal to an annualized rate of 0.5% of the lower of aggregate Capital Contributions or the Fund's NAV. | Not applicable. |

PNMAC Capital Management, LLC
Form ADV Part 2A

| Termination Fee | Adviser | The termination fee, payable for (1) the Public REIT's termination of the management agreement without cause or (2) Adviser's termination of the management agreement upon a default in the performance of any material term of the management agreement, will be equal to three times (a) the average annual base management fee and (b) the average annual (or, if the period is less than 24 months, annualized) incentive fee earned by Adviser during the prior 24-month period before termination. | Not applicable. | Not applicable. |

All advisory fees are negotiated with the client and are paid in arrears. Fees from the RIC and the Private Funds are deducted quarterly from client's accounts by the client's custodian and paid directly to the Adviser.

Clients maintain agreements with third parties for administration, custody, transfer agency and fund accounting services, and the clients pay for these certain services in addition to the advisory fees. Clients also maintain agreements with an affiliated loan servicer to provide loan servicing for generally all of the loans owned by the clients, which costs are in addition to the advisory and administrative services.

An affiliated client, PNMAC Mortgage Opportunity (Offshore) Fund, LTD, invests all of its assets in PNMAC Mortgage Opportunity Fund, LLC and does not pay a separate management or shareholder fee to the Adviser. Additional information regarding this client may be found in Item 10: Other Financial Industry Activities and Affiliations.

The Adviser, in its advisory capacity, may also earn cash and non-cash advisory compensation for assisting in or providing valuation services related to the securitization of mortgage pools.

Certain expenses are paid by the Adviser and are reimbursed by clients as follows:

*Public REIT*

The Public REIT pays all operating expenses, except those specifically required to be borne by the Adviser under the management agreement. Expenses actually incurred by the Adviser that are reasonably necessary for the performance by the Adviser of its duties and functions under the management agreement are reimbursable. Expenses not reimbursable to the Adviser include salaries and other compensation of its personnel. Certain other costs and expenses incurred by the Adviser and its affiliates in any quarter are reimbursable by the Public REIT subject to a cap. In addition, the Public REIT is required to pay pro rata portion of rent, telephone, utilities, office furniture, equipment, machinery and other office, internal and overhead expenses of the Adviser and its affiliates required for our operations. These expenses are allocated based on the ratio of the proportion of gross assets compared to all remaining gross assets

PNMAC Capital Management, LLC
Form ADV Part 2A

managed by the Adviser as calculated at each quarter end. The Public REIT and the Adviser shall modify this allocation methodology, subject to board of trustees' approval if the allocation becomes inequitable.

*Funds*

The Funds will be responsible for paying the compensation of the Adviser, due diligence, negotiation and broken deal expenses, fees and expenses of custodians, administrators, transfer and distribution agents, counsel and directors, insurance, filings and registrations, proxy expenses, expenses of communications to investors, interest, taxes, portfolio transaction expenses, indemnification, litigation and other extraordinary expenses and such other expenses as the Adviser is not obligated to provide (such as services the Adviser is required to supervise, review or coordinate) and as are approved by the directors as being reasonably related to the organization, offering, capitalization, operation, regulatory compliance or administration of the Company and any portfolio investments. Expenses associated with the general overhead of the Adviser will not be covered by the Funds. Funds will bear the costs and expenses of the Adviser pursuant to agreement, which may not be amended without the Adviser's written consent. Adviser may advance payment of any such fees and expenses and the Fund is obligated to reimburse the Adviser within 30 days following written request.

## ITEM 6: PERFORMANCE-BASED FEES AND SIDE-BY-SIDE MANAGEMENT

Performance-based fees are in the form of Incentive Compensation/Carried Interest, and are outlined in the table above.

The Adviser provides investment advisory services to affiliated funds including two closed end registered investment companies, a closed end private fund, an Offshore fund and a publicly traded REIT, and therefore may encounter potential conflicts of interest. Two of the Adviser's investment representatives are investors in the Private Fund. However, as a fiduciary, the Adviser strives to allocate all investment opportunities among its clients on a fair and equitable basis and in accordance with each client's stated investment objectives and restrictions. In addition, the Adviser's Chief Compliance Officer will perform periodic reviews of the investment allocations to the Funds and the REIT, to help ensure allocations remain fair and equitable.

## ITEM 7: TYPES OF CLIENTS

### *Description*

The Adviser focuses on affiliated clients that invest in mortgage related assets. The affiliated clients consist of two closed end registered investment companies, a closed end private fund, a Cayman Islands exempted company and a publicly traded REIT.

PNMAC Mortgage Opportunity Fund, LLC, invests substantially all of its assets in a limited partnership interest of PNMAC Mortgage Opportunity Fund, L.P. (the "Master Fund"), a limited partnership formed under the laws of the state of Delaware. The Master Fund operates as a

7

master fund in a master-feeder fund structure. The Master Fund acts as a central investment mechanism for PNMAC Mortgage Opportunity Fund, LLC, and PNMAC Opportunity Fund Associates, LLC, the General Partner of the Master Fund. The General Partner of the Master Fund has the exclusive right to conduct the operations of the Master Fund. PNMAC Mortgage Opportunity Fund, LLC held a 99.99% ownership interest in the Master Fund at December 31, 2011, 2010, and 2009. At December 31, 2012, December 31, 2013, December 31, 2014, and December 15, 2015, PNMAC Mortgage Opportunity Fund held a 91.8%, 89%, 85%, and 67% ownership of the Master Fund, respectively. PNMAC Mortgage Opportunity Fund, LLC is the sole limited partner in the Master Fund. Please see Item 10 for additional information on the affiliations of the Funds.

Currently the Adviser only provides services to affiliates and does not generally offer services to the public.

### *Conditions for Managing Accounts*

The Adviser does not impose any specific conditions for managing accounts; however, the Adviser focuses on its affiliated funds and does not generally offer its services to the public.

## ITEM 8: METHODS OF ANALYSIS, INVESTMENT STRATEGIES AND RISK OF LOSS

### *Methods of Analysis*

The Adviser's investment objective is to generate attractive risk adjusted return to our clients over the long term, according to each client's stated investment objective and policies. The Adviser utilizes proprietary analytical and portfolio management expertise and technology to review potential investments of residential whole loans and mortgage backed securities. The investment analysis review process involves reviewing loan collateral characteristics, aggregate loan portfolio profiles, cash flow analysis, and structure of investment acquisition.

### *Investment Strategies*

The investment strategy deployed targets specific niche areas in the residential mortgage sector that fit both the weighted average life and yield profile of a client's portfolio requirement.

### *Risk of Loss*

Investing in mortgage loans and mortgage related assets is risky and could result in loss. Clients should be aware of the risks and be prepared to bear any such loss.

Clients' investment activities expose them to the various types of risk, which are associated with the financial instruments and markets in which they invest.

Investments in mortgage-backed securities and mortgage loans have exposure to certain degrees of risk, including interest rate, market risk, and the potential non-payment of principal and interest, including default or bankruptcy of the issuer or the intermediary in the case of a participation. Mortgage loans are subject to prepayment risk, which will affect the maturity of such investments.

Investments in real estate acquired in settlement of loans are subject to various risk factors. Generally, real estate investments could be adversely affected by a recession or general economic downturn where the properties are located as well as the availability of similar properties in the immediate area. Real estate investment performance is also subject to the success that a particular property manager has in managing the property.

Clients are indirectly subject to interest rate risk. Interest rate risk is the risk that investment in loans held by the mortgage investments will decline in value because of changes in market interest rates. Investments in mortgage loans with long-term maturities may experience significant price declines if long-term interest rates increase.

Market risk represents the potential loss in value of financial instruments caused by movements in market factors including, but not limited to, market liquidity, investor sentiment, interest and foreign exchange rates. Client's portfolios include certain investments that are generally illiquid and have a greater amount of market risk than more liquid investments. These investments may trade in limited markets or have restrictions on resale or transfer and may not be able to be liquidated on demand if needed. The value assigned to these investments may differ significantly from the values that would have been used had a ready market existed and such differences could be material to the financial statements.

Adverse changes in economic conditions are more likely to lead to a weakened capacity of borrowers to make principal payments and interest payments. An economic downturn could severely affect the ability of highly leveraged borrowers to service their debt obligations or to repay their obligations. Under adverse market or economic conditions, the secondary market could contract further as well, increasing the illiquid nature of the loans. As a result, the Funds or the Public REIT could find it more difficult to sell loans or may be able to sell only at prices lower than if such investments were widely traded.

An investment in the Funds or the Public REIT is subject to investment risk, including the possible loss of the entire principal invested. An investment in the Funds or the Public REIT represents an indirect investment in the loans held by the mortgage companies. The value, like other market investments, may move up or down, sometimes rapidly and unpredictably. An investment in the Funds or the Public REIT at any point in time may be worth less than the original investment. Investment values can fluctuate for several reasons including the general condition of the mortgage market or when political or economic events affecting the issuers occur.

As part of its investment strategy, the Funds or the Public REIT may utilize borrowings. Client investments may also use borrowings in the ordinary course of their operations. The use of borrowings may materially affect the operations of the clients or their investments and thus its ultimate value. Financing may not always be available on acceptable terms, in the necessary amounts, or for the period needed. This could have a material negative impact on the performance

PNMAC Capital Management, LLC
Form ADV Part 2A

of the Funds or the Public REIT. The Public REIT may invest in mortgage-related derivatives, including, but not limited to, options, futures and derivatives on mortgage-backed securities. The prices of derivative instruments, including futures and options, are highly volatile. Options and futures are also subject to the risk of the failure of any of the exchanges on which positions trade or of our clearinghouses or counterparties. Option transactions may be part of a hedging strategy (*i.e.*, offsetting the risk involved in another securities position) or a form of leverage, in which the holder will have the right to benefit from price movements in a large number of securities with a small commitment of capital. These activities involve risks that can be substantial, depending on the circumstances.

The Funds clear substantially all of their investment purchases and sales and maintain substantially all of their investments and cash positions at the third party administrator and custodian. Credit risk is measured by the loss the Funds would record if administrator failed to perform pursuant to terms of their obligations.

Due to the nature of the master fund/feeder fund structure, the master fund could be materially affected by subscription or redemption activity.

Additional risks and risk factors are stated in each client's offering documents or Form 10-K:

- o PNMAC Mortgage Opportunity Fund, LLC Confidential Private Placement Memorandum Amended and Restated as of September 30, 2008
- o PNMAC Mortgage Opportunity Fund Investors, LLC Confidential Private Placement Memorandum Amended and Restated as of September 30, 2008
- o PNMAC Mortgage Opportunity (Offshore) Fund, LTD. (a Cayman Islands Exempted Company) Offshore Wrapper to the Confidential Private Placement Memorandum of PNMAC Mortgage Opportunity Fund, LLC July, 2008
- o PennyMac Mortgage Investment Trust's most recent Annual Report on Form 10-K

The Adviser does not represent, guarantee or imply that the services or methods of analysis employed by us can or will predict future results, successfully identify market tops or bottoms, or insulate clients from losses due to market corrections or declines.

## ITEM 9: DISCIPLINARY INFORMATION

Registered investment advisers are required to disclose all material facts regarding any legal or disciplinary events that would be material to a client's or prospective client's evaluation of an adviser or the integrity of its management. With the exception of the litigation described below, the Adviser does not have any such legal or disciplinary events.

The litigation described below has been brought against Stanford Kurland, Chief Executive Officer and Director of the Adviser, and David Spector, Executive Managing Director and Chief Investment Officer and Director of the Adviser, in connection with their former employment at Countrywide Financial Corporation. The litigation has no connection to the Adviser.

*Luther, et al. v. Countrywide Financial Corporation, et al. (USDC, Central District of California, Case No. 12-cv-5125) (USCA, Ninth Circuit, Case Nos. 14-55121, 14-55125)*

10

In this case filed on November 14, 2007, the plaintiffs are a class of persons who purchased or otherwise acquired mortgage-backed securities ("MBS") issued by several Countrywide-related entities. The plaintiffs claim the Registration Statements and Prospectus Supplements related to those securities contained material misrepresentations or omissions. The sole claim against Messrs. Kurland and Spector was a claim under Section 11 of the Securities Act of 1933 predicated on Registration Statements that they allegedly signed.

On April 17, 2013, Bank of America, which acquired Countrywide Financial Corporation, reached a consolidated settlement of the *Luther*, *Western Teamsters*, and *Maine State* lawsuits (see below). Under the agreement, Bank of America agreed to a settlement payment of $500 million in exchange for a global release and the dismissal of the lawsuits in their entirety. The Court granted the plaintiffs' motion for final approval of the settlement on December 5, 2013, and entered final judgment and dismissed the case with prejudice in its entirety on December 17, 2013. Neither Messrs. Kurland nor Spector have admitted any liability in connection with the sole claim against them nor have they paid any amounts under the settlement.

On January 15, 2014, the class members who objected to the consolidated settlement filed notices of appeal in all three cases in the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit") challenging the U.S. District Court's final approval of the settlement. The appeals in each case are pending and will be decided together.

On November 24, 2015, the Ninth Circuit set a hearing date on the consolidated appeals for February 3, 2016. The Ninth Circuit took that hearing off calendar, and on January 26, 2016, gave notice that it was considering the May 2016 calendar for oral argument on the consolidated appeals. No oral argument date has been set.

***Maine State Retirement System v. Countrywide Financial Corporation, et al. (USDC, Central District of California, Case No. 10-cv-00302) (USCA, Ninth Circuit, Case Nos. 14-55093, 14-55128, 14-55140)***

In this case filed on January 14, 2010, the plaintiffs are a class who purchased or acquired certain Countrywide MBS. They allege that the Registration Statements and Prospectus Supplements pursuant to which the MBS were offered contained material misrepresentations or omissions. The initial complaint alleged violations of Sections 11, 12 and 15 of the Securities Act in connection with 427 separate MBS offerings. The lead plaintiffs filed an amended complaint on June 6, 2011 and dropped the Section 15 claims against Messrs. Kurland and Spector.

On October 12, 2011, the Court certified the lawsuit as a class action. On April 17, 2013, Bank of America reached a consolidated settlement of the *Luther*, *Western Teamsters*, and *Maine State* lawsuits. Under the agreement, Bank of America agreed to a settlement payment of $500 million in exchange for a global release and the dismissal of the lawsuits in their entirety. The Court granted the plaintiffs' motion for final approval of the settlement on December 5, 2013, and entered a final judgment and dismissed the case with prejudice in its entirety on December 17, 2013. Neither Messrs. Kurland nor Spector have admitted any liability in connection with the sole claim against them nor have they paid any amounts under the settlement.

On January 15, 2014, the class members who objected to the consolidated settlement in filed notices

of appeal in all three cases in the Ninth Circuit, challenging the U.S. District Court's final approval of the settlement. The appeals in each case are pending and will be decided together.

On November 24, 2015, the Ninth Circuit set a hearing date on the consolidated appeals for February 3, 2016. The Ninth Circuit took that hearing off calendar, and on January 26, 2016, gave notice that it was considering the May 2016 calendar for oral argument on the consolidated appeals. No oral argument date has been set.

***Western Conference of Teamsters Pension Trust Fund v. Countrywide Financial Corporation, et al. (USDC, Central District of California, Case No. 12-cv-5122) (USCA, Ninth Circuit, Case Nos. 14-55120, 14-55122)***

This class action case, filed on November 17, 2010, alleges claims against various Countrywide entities and former executives under the Securities Act on behalf of a class of investors who purchased MBS from various Countrywide entities. The plaintiffs allege that Messrs. Kurland and Spector violated Section 11 of the Securities Act by signing Registration Statements that contained material misstatements or omissions.

On April 17, 2013, Bank of America, which eventually acquired Countrywide Financial Corporation, reached a consolidated settlement of the *Luther*, *Western Teamsters*, and *Maine State* lawsuits. Under the agreement, Bank of America agreed to a settlement payment of $500 million in exchange for a global release and the dismissal of the lawsuits in their entirety. The Court granted the plaintiffs' motion for final approval of the settlement on December 5, 2013, and entered final judgment and dismissed the case with prejudice in its entirety on December 17, 2013. Neither Messrs. Kurland nor Spector have admitted any liability in connection with the sole claim against them nor have they paid any amounts under the settlement.

On January 15, 2014, the class members who objected to the consolidated settlement and filed notices of appeal in all three cases in the Ninth Circuit, challenging the U.S. District Court's final approval of the settlement. The appeals in each case are pending and will be decided together.

On November 24, 2015, the Ninth Circuit set a hearing date on the consolidated appeals for February 3, 2016. The Ninth Circuit took that hearing off calendar, and on January 26, 2016, gave notice that it was considering the May 2016 calendar for oral argument on the consolidated appeals. No oral argument date has been set.

## ITEM 10: OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS

### *Financial Industry Activities*

The Adviser's clients maintain agreements with an affiliated servicer, PennyMac Loan Services, LLC ("PLS"). PLS performs loan servicing for most of the loans owned by the Adviser's clients. Each client acknowledges the use of the affiliated servicer PLS through the execution of Servicing Agreements. PLS earns servicing fees from each investment client for servicing portions of its loan portfolio.

### *Affiliations*

The Adviser is affiliated with the following entities:

PNMAC Capital Management, LLC
Form ADV Part 2A

- PennyMac Loan Services, LLC - the loan servicer, which receives compensation from clients
- PNMAC Loan Services, Inc. – a real estate broker
- PennyMac Mortgage Investment Trust – a client and a public company
- PNMAC Mortgage Opportunity Fund, LLC – a client and a registered investment company
- PNMAC Mortgage Opportunity Fund, LP- a client and a registered investment company, wholly owned by PNMAC Mortgage Opportunity Fund, LLC
- PNMAC Mortgage Opportunity Fund Investors, LLC- a client and an unregistered (a private) fund
- PNMAC Mortgage Opportunity (Offshore) Fund, LTD- a client and a Cayman Islands exempted company that invests in PNMAC Mortgage Opportunity Fund LLC
- PNMAC Opportunity Fund Associates, LLC – the Adviser is the managing member of this limited liability company, which is the general partner of the PNMAC Mortgage Opportunity Fund, LP.

Clients should be aware that there may be certain direct and indirect economic benefits received by the Adviser due to these affiliations, which create conflicts of interest and may indirectly influence the Adviser's choice of investments for clients; however, as a fiduciary to our clients, we endeavor at all times to put the interest of our clients first and the Adviser will make investment decisions for each client that are suitable based on a particular client's investment objectives and policies.

## ITEM 11: CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND PERSONAL TRADING

### *Description of Code of Ethics*

The Adviser's current Code of Ethics is prepared in accordance with applicable federal securities laws. General principles and specific provisions include:

- At all times, the interests of the Adviser's clients must come first;

- Personal security transactions must be conducted consistent with the code in a manner that avoids any actual or potential conflict of interest; No inappropriate advantage should ever be taken of any position of trust and responsibility.

- The Adviser prohibits Access Persons from engaging in any outside business activities or employment that conflict with their job at the Adviser; and

- The Adviser has policies with respect to giving or receiving gifts and entertainment, including reporting of gifts and entertainment over certain de minimus levels.

- The Adviser requires pre-approval for certain political contributions made by "Covered Associates," as well as periodic reporting of political contributions by employees.

The Adviser's affiliate, a loan servicer, may receive compensation or compensation-in-kind as a result of servicing the investment loan portfolio. The Adviser may make investment decisions based on access to the right to service a mortgage loan portfolio. The Adviser will make

13

PNMAC Capital Management, LLC
Form ADV Part 2A

investment decisions for each client that are suitable, based on a particular client's investment objectives and policies and in accordance with the Adviser's fiduciary duties, irrespective of whether its affiliated loan servicer receives servicing rights.

The Code of Ethics will be provided to any client or prospective client upon request.

The Adviser does not participate in client transactions but may receive compensation or compensation-in-kind relating to the activities of its affiliated loan servicing entity.

## ITEM 12: BROKERAGE PRACTICES

The Adviser may select dealers or brokers to execute the purchases and sales of clients' investments. If any dealers or brokers are used in connection with the purchase or sale of any investments, the Adviser will seek best execution for each transaction that provides the best available price and most favorable execution reasonably obtainable under the circumstances.

Best execution may be measured over time through several transactions rather than a single transaction. Clients generally do not pay commissions on investment transactions as substantially all transaction are on a principal basis with dealers or directly with the sellers which may or may not include a markup or a markdown. The Adviser does not utilize soft dollar arrangements; however, the Adviser may from time to time receive subscriptions to industry publications and conference attendance sponsored by certain brokers.

As the Adviser enters into the purchase of residential mortgages through either a whole loan or securities structure, risk/expected return needs to be allocated to ensure that each fund receives it pro-rata share based on capital available for investment.

The Adviser does not allocate loans among client accounts.

The Adviser does not effect any principal or agency cross securities transactions for client accounts, nor does it effect cross-trades between client accounts. Principal transactions are generally defined as transactions where an adviser or an account in which the Adviser and or its principals and control persons own more than 25% of the account, acting as principal, buys from or sells any security to any advisory client. An agency cross transaction is defined as a transaction where a person acts as an investment adviser in relation to a transaction in which the investment adviser, or any person controlled by or under common control with the investment adviser, acts as broker for both the advisory client and for another person on the other side of the transaction. Should the Adviser ever decide to effect principal trades or cross-trades in client accounts, it will comply with the provisions of Section 206(3) of the Advisers Act and the rules thereunder.

## ITEM 13: REVIEW OF ACCOUNTS

The Adviser reviews client accounts at least monthly by a meeting of the Valuation Committee. The members of the committee include each of the persons providing investment advice and making investment decisions for clients. Those individuals are the Chief Executive Officer, the Chief Investment Officer, the Chief Credit Officer, the Chief Capital Markets Officer and the

14

Chief Business Development Officer. The accounts are reviewed for valuation, return and composition. Clients receive a monthly statement as well as a corresponding monthly newsletter providing market color and indices for relevant markets.

## ITEM 14: CLIENT REFERRALS AND OTHER COMPENSATION

The Adviser does not currently have any relationship with any third-party firm or individual whose purpose is marketing and/or gathering assets for us. The Adviser may in the future enter into arrangements for third-party marketing services although none are contemplated at this time. Any and all such arrangements would be disclosed to potential clients and current clients.

The Adviser has affiliations with certain companies that provide services to our clients. Because of such arrangements, the Adviser receives certain direct and indirect compensation. In addition, these relationships create certain conflicts of interest between the Adviser and our clients. Please refer to Item 10 for further information, including how such conflicts are addressed by us.

## ITEM 15: CUSTODY

The Adviser uses a third party custodian and such custodian is responsible for, among other things, fund administration, including fund accounting, investor reporting and serving as the custodian for the fund assets. The Adviser does not perform custodial services.

The Custodian and the Adviser each send monthly or quarterly statements to Funds. Each Fund should compare the statements from both the Adviser and Custodian, as applicable, to ensure the information and the account values are the same.

Pursuant to Rule 206(4)-2 of the Advisers Act, the Adviser is deemed to have custody of client funds since the Adviser has the authority and ability to debit our fees directly from clients' accounts, and because the Adviser serves as the managing member to the Private Fund. To mitigate any potential conflicts of interests due to this arrangement, all our client account assets are maintained with an independent non-affiliated qualified bank custodian.

As outlined in Rule 206(4)-2 of the Investment Advisers Act of 1940, investment advisers that are deemed to have custody of client assets (other than through the ability to debit fees) are generally required to have an annual independent verification of those assets. The verification must be in the form of a surprise examination performed by an independent non-affiliated certified public accountant. However, an exception applies in the case of private investment funds, so long as the Private Fund is receiving annual audits of their financial statements performed by an independent public accountant, which is registered with and subject to regular inspection by the Public Company Accounting Oversight Board (PCAOB). In addition, the audited financial statements must be prepared in accordance with Generally Accepted Accounting Principles (GAAP) and distributed to all investors within 120 days of the end of the private fund's fiscal year. The private funds also must receive an audit upon full liquidation and the audited financial statements must be distributed to all of a fund's investors promptly after the completion of such audit.

Currently, the Adviser does not have annual surprise audits performed since the Private Fund client is receiving annual audits of its financial statements by a public accounting firm that is registered with and subject to regular inspection by the PCAOB. We also assist the Private Fund

with the distribution of the audited financial statements to all its investors and ensure such distributions are made within 120 days of the Private Fund's fiscal year end. Should the Private Fund liquidate its assets, we will ensure its financial statements are audited at that time and distributed to investors.

## ITEM 16: INVESTMENT DISCRETION

### *Discretionary Authority: Limitations*

### A. Discretionary Authority; Limitations
The Adviser has been granted discretion, and has the authority to determine the following without consulting with clients first:

> (1) the selection and amount of securities to be bought or sold for client accounts;
> (2) whether a client's transaction should be combined with those of other clients and traded as a "block";
> (3) commission rates and/or transaction cost paid to effect the transactions.

However, such authority may be subject to specified investment objectives, guidelines, and/or conditions imposed by the client. For example, a client may specify that the investment in any particular stock or industry should not exceed specified percentages of the value of their portfolio, or require restrictions and/or prohibitions of transactions in the securities of a specific industry.

### B. Limited Power of Attorney
The Adviser is authorized to exercise full discretionary authority via a limited power of attorney contained in written agreements, executed between the Adviser and our clients. The Adviser is designated as a client's attorney-in-fact with discretionary authority to effect investment transactions in a client's account which authorizes the Adviser to give instructions to third parties in furtherance of such authority.

## ITEM 17: VOTING CLIENT SECURITIES

### Proxy Voting Policy
The Adviser has adopted and implemented written policies and procedures that are reasonably designed to ensure that all proxy voting of client securities are always in the best interest of the clients. However, the Adviser's policy for equity securities is to not vote for this class of securities since this class is not an investment target of any client.

It is the Adviser's policy to vote matters relating to mortgage-backed securities by bringing the matter to the investment committee for careful consideration including determining whether there is a material conflict between the Adviser and client or other clients. In all instances proxy voting will be in the best interest of the clients.

In the event of a material conflict the Adviser shall request direction from the client. In the event that a material conflict cannot be addressed by taking client direction the Adviser shall utilize a third party service.

Clients may request a copy of the Adviser's Proxy Voting Policy or information about how the Advisor voted their securities by contacting us at our offices. Such contact information is reflected

**PNMAC Capital Management, LLC**
**Form ADV Part 2A**

on the cover page of this Brochure.

## ITEM 18: FINANCIAL INFORMATION

The Adviser does not require or solicit prepayment of more than $1,200 in fees per client, six months or more in advance and therefore is not required to provide, and has not provided, a balance sheet. We do not have any financial commitments that impair our ability to meet contractual and fiduciary obligations to clients, and have not been the subject of a bankruptcy proceeding.

17

# EXHIBIT C

EX-21.1 7 d839354dex211.htm EX-21.1

Exhibit 21.1

## LIST OF PENNYMAC MORTGAGE INVESTMENT TRUST ENTITIES
### as of December 31, 2014

| Entity | Entity Type | State of Incorporation |
|---|---|---|
| PC REO Trust | Statutory trust | Delaware |
| PCNPL Trust | Statutory trust | Delaware |
| PennyMac Corp. | Corporation | Delaware |
| PennyMac GP OP, Inc. | Corporation | Delaware |
| PennyMac Holdings, LLC | Limited liability company | Delaware |
| PennyMac Operating Partnership, L.P. | Limited partnership | Delaware |
| PennyMac Securities Holding, LLC | Limited liability company | Delaware |
| PMC REO Financing Trust | Statutory trust | Delaware |
| PMT Funding, LLC | Limited liability company | Delaware |
| PMT Insurance, LLC | Limited liability company | Missouri |
| PMT NPL Financing 2014-1 | Statutory trust | Delaware |
| PMT NPL Financing, LLC | Limited liability company | Delaware |
| SWDNSI Trust Series 2010-3 | Statutory trust | Delaware |
| SWDNSI Trust Series 2010-4 | Statutory trust | Delaware |
| TRS REO Finance, LLC | Limited liability company | Delaware |
| TRS REO Trust 1-A | Statutory trust | Delaware |
| TRS REO Trust 2-B | Statutory trust | Delaware |

# EXHIBIT D

# CORPORATE CHARTER APPROVAL SHEET
## **EXPEDITED SERVICE**     ** KEEP WITH DOCUMENT **

DOCUMENT CODE _10_     BUSINESS CODE _13_

\# _____

Close _____    Stock _____✓_____    Nonstock _____

P.A. _____    Religious _____

Merging (Transferor) _____

_____

_____

_____

Surviving (Transferee) _____

_____

_____

---

Affix Barcode Label Here

||||||||||||||||||||||||||||||||||||||||||

1000361998044188

Affix Barcode Label Here
ID # D13055041 ACK # 1000361998044188
PAGES: 0007
PENNYMAC MORTGAGE INVESTMENT TRUST

05/18/2009  AT 10:34 A WO # 0001723788

New Name _____

_____

_____

---

**FEES REMITTED**

| | |
|---|---|
| Base Fee: | _100_ |
| Org. & Cap. Fee: | _20_ |
| Expedite Fee: | _50_ |
| Penalty: | _____ |
| State Recordation Tax: | _____ |
| State Transfer Tax: | _____ |
| _____ Certified Copies | _____ |
| Copy Fee: | _____ |
| _____ Certificates | _____ |
| Certificate of Status Fee: | _____ |
| Personal Property Filings: | _____ |
| Mail Processing Fee: | _____ |
| Other: | _____ |
| **TOTAL FEES:** | _170_ |

Credit Card _____    Check _____✓_____    Cash _____

_____ Documents on _____ Checks

Approved By: _(MM)13_

Keyed By: _____

COMMENT(S): _____

_____ Change of Name
_____ Change of Principal Office
_____ Change of Resident Agent
_____ Change of Resident Agent Address
_____ Resignation of Resident Agent
_____ Designation of Resident Agent
          and Resident Agent's Address
_____ Change of Business Code

_____ Adoption of Assumed Name

_____

_____ Other Change(s)

_____

_____

Code _1907_

Attention: _____

THE CORPORATION TRUST INCORPORATED
300 E LOMBARD ST.
SUITE 1400
BALTIMORE MD 21202-3219

---

**Stamp Work Order and Customer Number HERE**

STATE OF MARYLAND
DEPT OF ASSESSMENTS AND TAXATION
CUST ID:0002607550
WORK ORDER:0001723788
DATE:05-18-2009 10:41 AM
AMT. PAID:$170.00

SDAT ID:MARYLAND
BY: C RASSEAONS AND TRANION
CUST ID:0002280750
WORK ORDER:0001723788
DATE:05-13-2009 12:18 PM
AMT. PAID:$170.00

# PENNYMAC MORTGAGE INVESTMENT TRUST

## DECLARATION OF TRUST

### Dated:  May 15, 2009

This DECLARATION OF TRUST is made as of the date set forth above by the undersigned Trustees (as defined herein).

### ARTICLE I.

### FORMATION

The Trust is a real estate investment trust within the meaning of Title 8 of the Corporations and Associations Article of the Annotated Code of Maryland, as amended from time to time ("Title 8").  The Trust shall not be deemed to be a general partnership, limited partnership, joint venture, joint stock company or a corporation (but nothing herein shall preclude the Trust from being treated for tax purposes as an association under the Internal Revenue Code of 1986, as amended from time to time (the "Code")).

### ARTICLE II.

### NAME

The name of the Trust is:

#### PennyMac Mortgage Investment Trust

Under circumstances in which the Board of Trustees of the Trust (the "Board of Trustees" or "Board") determines that the use of the name of the Trust is not practicable, the Trust may use any other designation or name for the Trust.

2009 MAY 18  A 10: 34
RECEIVED
DEPARTMENT OF
ASSESSMENTS & TAXATION

### ARTICLE III.

### PURPOSES AND POWERS

Section 3.01.   Purposes.  The purposes for which the Trust is formed are to engage in any businesses and activities that a trust formed under Title 8 may legally engage in, including, without limitation or obligation, engaging in business as a real estate investment trust under the Code.

Section 3.02.   Powers.  The Trust shall have all of the powers granted to real estate investment trusts by Title 8 and all other powers which are not inconsistent with law and are appropriate to promote and attain the purposes set forth in the Declaration of Trust.

NY1 6965518v.3

## ARTICLE IV.

### RESIDENT AGENT

The name of the resident agent of the Trust in the State of Maryland is The Corporation Trust Incorporated, whose office address is 300 East Lombard Street, Baltimore, MD 21202. The resident agent of the Trust is a Maryland corporation. The Trust may have such offices or places of business within or outside the State of Maryland as the Board of Trustees may from time to time determine.

## ARTICLE V.

### BOARD OF TRUSTEES

**Section 5.01.  Powers.** Subject to any express limitations contained in the Declaration of Trust or in the bylaws of the Trust (the "Bylaws"), (a) the business and affairs of the Trust shall be managed under the direction of the Board of Trustees and (b) the Board shall have full, exclusive and absolute power, control and authority over any and all property of the Trust. The Board may take any action as in its sole judgment and discretion is necessary or appropriate to conduct the business and affairs of the Trust. The Declaration of Trust shall be construed with the presumption in favor of the grant of power and authority to the Board. Any construction of the Declaration of Trust or determination made in good faith by the Board concerning its powers and authority hereunder shall be conclusive. The enumeration and definition of particular powers of the Board of Trustees included in the Declaration of Trust or in the Bylaws shall in no way be limited or restricted by reference to or inference from the terms of this or any other provision of the Declaration of Trust or the Bylaws or construed or deemed by inference or otherwise in any manner to exclude or limit the powers conferred upon the Board or the trustees of the Trust (collectively, the "Trustees" and, individually, a "Trustee") under the general laws of the State of Maryland or any other applicable laws.

The Board, without any action by the shareholders of the Trust (collectively, the "Shareholders" and, individually, a "Shareholder"), shall have and may exercise, on behalf of the Trust, without limitation, the power to:  terminate the status of the Trust as a real estate investment trust under the Code; adopt, amend and repeal Bylaws; elect officers in the manner prescribed in the Bylaws; solicit proxies from holders of shares of beneficial interest of the Trust; and do any other acts and deliver any other documents necessary or appropriate to the foregoing powers.

**Section 5.02.  Number.** The number of Trustees initially shall be two, which number may thereafter be increased or decreased by the Trustees then in office from time to time; however, the total number of Trustees shall be not less than one and not more than 15. No reduction in the number of Trustees shall cause the removal of any Trustee from office prior to the expiration of his or her term.

**Section 5.03.  Initial Board.** The initial Board of Trustees shall be comprised of two Trustees. The names and addresses of the initial Trustees who shall serve until the earlier of the first annual meeting and until their successors are duly elected and qualify are:

- 2 -

NYI 6965518v.3

<u>Name</u>

Stanford L. Kurland

David A. Spector

Section 5.04.   <u>Term</u>.   The Trustees shall be elected at each annual meeting of the Shareholders and shall serve until the next annual meeting of the Shareholders and until their successors are duly elected and qualify.

Section 5.05.   <u>Removal</u>.   A Trustee may be removed, at any time, with or without cause, by the affirmative vote of the holders of two-thirds of the Shares (as defined below) then outstanding and entitled to vote generally in the election of Trustees.

## ARTICLE VI.

## SHARES OF BENEFICIAL INTEREST

The beneficial interest in the Trust shall be divided into shares of beneficial interest ("<u>Shares</u>").   The total number of Shares which the Trust has authority to issue is 5,000,000 common shares of beneficial interest, $0.01 par value per share.   The Board of Trustees may classify or reclassify any unissued Shares from time to time by setting or changing the preferences, conversion or other rights, voting powers, restrictions, limitations as to dividends or other distributions, qualifications or terms or conditions of redemption of the Shares.

The Board of Trustees, without any action by the Shareholders of the Trust, may amend the Declaration of Trust from time to time to increase or decrease the aggregate number of Shares of any class that the Trust has authority to issue.

The Board of Trustees may authorize the issuance from time to time of Shares of any class or series, whether now or hereafter authorized, or securities or rights convertible into Shares of any class or series, whether now or hereafter authorized, for such consideration (whether in cash, property, past or future services, obligation for future payment or otherwise) as the Board of Trustees may deem advisable (or without consideration in the case of a Share split or Share dividend), subject to such restrictions or limitations, if any, as may be set forth in the Declaration of Trust or the Bylaws of the Trust.

## ARTICLE VII.

## SHAREHOLDERS

Section 7.01.   <u>Annual Meeting</u>.   There shall be an annual meeting of the Shareholders, to be held after delivery of the annual report and on proper notice to the Shareholders, at such time and place as shall be determined by resolution of the Board of Trustees.

Section 7.02.   <u>Preemptive and Appraisal Rights.</u>   Except as may be provided by the Board of Trustees in setting the terms of classified or reclassified Shares pursuant to Article VI, no holder of Shares shall, as such holder, (a) have any preemptive right to purchase or subscribe

- 3 -

for any additional Shares of the Trust or any other security of the Trust which it may issue or sell or (b), except as expressly required by Title 8, have any right to require the Trust to pay the fair value of his or her Shares in an appraisal or similar proceeding.

ARTICLE VIII.

LIABILITY OF SHAREHOLDERS, TRUSTEES, OFFICERS,
EMPLOYEES AND AGENTS, AND TRANSACTIONS
BETWEEN THEM AND THE TRUST

Section 8.01.  Limitation of Shareholder Liability.  No Shareholder shall be liable for any debt, claim, demand, judgment or obligation of any kind of, against or with respect to the Trust by reason of being a Shareholder, nor shall any Shareholder be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person in connection with the property or affairs of the Trust.

Section 8.02.  Limitation of Trustee and Officer Liability.  To the maximum extent that Maryland law in effect from time to time permits limitation of the liability of trustees and officers of a real estate investment trust, no Trustee or officer of the Trust shall be liable to the Trust or to any Shareholder for money damages.  Neither the amendment or repeal of this Section, nor the adoption or amendment of any other provision of this Declaration of Trust inconsistent with this Section, shall apply to or affect in any respect the applicability of the preceding sentence with respect to any act or failure to act which occurred prior to such amendment, repeal or adoption.

Section 8.03.  Express Exculpatory Clauses in Instruments.  Neither the Shareholders, nor the Trustees, officers, employees or agents of the Trust shall be liable under any written instrument creating an obligation of the Trust, and all persons shall look solely to the property of the Trust for the payment of any claim under or for the performance of that instrument.  The omission of the foregoing exculpatory language from any instrument shall not affect the validity or enforceability of such instrument and shall not render any Shareholder, Trustee, officer, employee or agent liable thereunder to any third party, nor shall any Shareholder, officer, employee or agent of the Trust be liable to anyone for such omission.

Section 8.04.  Indemnification.  The Trust shall have the power, to the maximum extent permitted by Maryland law, to obligate itself to indemnify, and to pay or reimburse reasonable expenses in advance of final disposition of a proceeding to, each Shareholder, Trustee, officer, employee or agent of the Trust (including any person who, while a Trustee of the Trust, is or was serving at the request of the Trust as a director, officer, manager, partner, trustee, employee or agent of another foreign or domestic corporation, limited liability company, partnership, real estate investment trust, joint venture, trust, other enterprise or employee benefit plan) from all claims and liabilities to which such person may become subject by reason of being or having been a Shareholder, Trustee, officer, employee or agent.

Section 8.05.  Transactions Between the Trust and its Shareholders, Trustees, Officers, Employees and Agents.  Subject to any express restrictions in this Declaration of Trust or adopted by the Trustees in the Bylaws or by resolution, the Trust may enter into any contract or

- 4 -

NY1 6963518v.3

transaction of any kind (including, without limitation, for the purchase or sale of property or for any type of services, including those in connection with underwriting or the offer or sale of securities of the Trust) with any person, including any Shareholder, Trustee, officer, employee or agent of the Trust or any person affiliated with a Shareholder, Trustee, officer, employee or agent of the Trust, whether or not any of them has a financial interest in such transaction.

## ARTICLE IX.

## AMENDMENT

Section 9.01.  General.  This Declaration of Trust may not be amended except as provided in this Article IX.

Section 9.02.  By the Board.  The Board, with the approval of two-thirds of its members, and without action by the Shareholders, may amend this Declaration of Trust from time to time to enable the Trust to qualify as a real estate investment trust under Title 8. In addition, a majority of the entire Board, without action by the Shareholders, may amend this Declaration of Trust in any respect in which the charter of a corporation may be amended in accordance with Section 2-605 of Corporations and Associations Article of the Maryland General Corporation Law.

Section 9.03.  By Shareholders.  Except as provided in Section 9.02 of this Article IX, this Declaration of Trust may be amended only by the affirmative vote of the holders of not less than a majority of the Shares then outstanding and entitled to vote thereon.

## ARTICLE X.

## DURATION OF TRUST

The Trust shall continue perpetually unless terminated pursuant to any applicable provision of Title 8.

## ARTICLE XI.

## MISCELLANEOUS

This Declaration of Trust is executed by the Trustees and delivered in the State of Maryland with reference to the laws thereof, and the rights of all parties and the validity, construction and effect of every provision hereof shall be subject to and construed according to the laws of the State of Maryland without regard to conflicts of laws provisions thereof.

*[END OF PAGE.  SIGNATURE PAGE FOLLOWS.]*

NY1 6965510v.3

IN WITNESS WHEREOF, this Declaration of Trust has been executed on this 15th day of May, 2009 by the undersigned Trustees, each of whom acknowledges that this document is his act, that to the best of his knowledge, information, and belief, the matters and facts set forth herein are true in all material respects and that this statement is made under the penalties for perjury.

_____
Stanford L. Kurland, Trustee

_____
David A. Spector, Trustee

I hereby accept the appointment as resident agent:

THE CORPORATION TRUST INCORPORATED

By: _____
    Name:
    Title:

NY1 6965518v.3

# EXHIBIT E

> The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
> The reader should not assume that the information is accurate and complete.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549
## FORM 13F

## FORM 13F COVER PAGE

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0006 |
| Expires: | July 31, 2015 |
| Estimated average burden hours per response: | 23.8 |

Report for the Calendar Year or Quarter Ended: 09-30-2014

Check here if Amendment [X] Amendment Number: 1

This Amendment (Check only one.): [X] is a restatement.

[ ] adds new holdings entries.

### Institutional Investment Manager Filing this Report:

Name:        State Street Corp

Address:     One Lincoln Street

             Boston, MA  02111

Form 13F File Number:   028-00399

**The institutional investment manager filing this report and the person by whom it is signed hereby represent that the person signing the report is authorized to submit it, that all information contained herein is true, correct and complete, and that it is understood that all required items, statements, schedules, lists, and tables, are considered integral parts of this form.**

Person Signing this Report on Behalf of Reporting Manager:

Name:        Sean P. Newth

Title:       SVP-Chief Accounting Officer and Controller

Phone:       617-664-8213

### Signature, Place, and Date of Signing:

/s/ Sean P. Newth          Boston, MA     11-11-2014

    [Signature]          [City, State]      [Date]

### Report Type (Check only one.):

[X] 13F HOLDINGS REPORT. (Check here if all holdings of this reporting manager are reported in this report.)

[ ] 13F NOTICE. (Check here if no holdings reported are in this report, and all holdings are reported by other reporting manager(s).)

[ ] 13F COMBINATION REPORT. (Check here if a portion of the holdings for this reporting manager are reported in this report and a portion are reported by other reporting manager(s).)

# Form 13F Summary Page

**Report Summary:**

| | |
|---|---|
| Number of Other Included Managers: | 10 |
| Form 13F Information Table Entry Total: | 3,689 |
| Form 13F Information Table Value Total: | 929,397,884 |
| | (thousands) |

**List of Other Included Managers:**

Provide a numbered list of the name(s) and Form 13F file number(s) of all institutional investment managers with respect to which this report is filed, other than the manager filing this report.

[If there are no entries in this list, state "NONE" and omit the column headings and list entries.]

| No. | Form 13F File Number | Name |
|---|---|---|
| 1 | 28-00733 | State Street Bank and Trust Company |
| 2 | 28-11338 | SSgA Funds Management, Inc. |
| 5 | 28-11326 | State Street Global Advisors LTD |
| 6 | 28-11327 | State Street Global Advisors Ltd. |
| 8 | 28-11330 | State Street Global Advisors, Australia |
| 10 | 28-11332 | State Street Global Advisors (Japan) Co., Ltd. |
| 12 | 28-11331 | State Street Global Advisors Asia LTD |
| 13 | 28-11334 | State Street Global Advisors GmbH |
| 18 | 28-13812 | State Street Global Advisors France, S.A. |
| 19 | 28-14459 | State Street Global Advisors Ireland Limited |

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
**FORM 13F**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0006 |
| Expires: | July 31, 2015 |
| Estimated average burden hours per response: | 23.8 |

**FORM 13F INFORMATION TABLE**

| COLUMN 1 | COLUMN 2 | COLUMN 3 | COLUMN 4 | COLUMN 5 | | COLUMN 6 | COLUMN 7 | COLUMN 8 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | VALUE | SHRS OR | SH/ PUT/ | INVESTMENT | OTHER | VOTING AUTHORITY | | |
| NAME OF ISSUER | TITLE OF CLASS | CUSIP | (x$1000) | PRN AMT | PRN CALL | DISCRETION | MANAGER | SOLE | SHARED | NONE |
| ADOBE SYSTEMS INC | Common equity shares | 00724F101 | 1,334,710 | 19,290,479 | SH | DFND | 1,2,5,6,8,10,12,18 | 19,290,479 | 0 | 0 |
| AGILENT TECHNOLOGIES INC | Common equity shares | 00846U101 | 764,091 | 13,409,893 | SH | DFND | 1,2,5,6,8,10,12,18 | 13,409,893 | 0 | 0 |
| ANALOG DEVICES | Common equity shares | 032654105 | 638,709 | 12,905,847 | SH | DFND | 1,2,5,6,8,10,12,18 | 12,905,847 | 0 | 0 |
| AON PLC | Common equity shares | G0408V102 | 1,301,000 | 14,839,633 | SH | DFND | 1,2,5,6,8,10,12,18 | 12,419,150 | 0 | 2,420,483 |
| APOLLO EDUCATION GROUP INC | Common equity shares | 037604105 | 77,754 | 3,091,683 | SH | DFND | 1,2,5,6,8,12,17,18 | 3,091,683 | 0 | 0 |
| BB&T CORP | Common equity shares | 054937107 | 1,212,455 | 32,584,416 | SH | DFND | 1,2,5,6,8,10,12,18 | 32,584,416 | 0 | 0 |
| CARDINAL HEALTH INC | Common equity shares | 14149Y108 | 1,259,677 | 16,817,784 | SH | DFND | 1,2,5,6,8,10,12,18 | 16,817,784 | 0 | 0 |
| CARMAX INC | Common equity shares | 143130102 | 414,523 | 8,924,058 | SH | DFND | 1,2,5,6,8,10,12,18 | 8,924,058 | 0 | 0 |
| CATERPILLAR INC | Common equity shares | 149123101 | 5,795,456 | 58,522,190 | SH | DFND | 1,2,5,6,8,10,12,17,18 | 31,733,002 | 0 | 26,789,188 |
| CHUBB CORP | Common equity shares | 171232101 | 1,146,269 | 12,585,281 | SH | DFND | 1,2,5,6,8,10,12,18 | 12,585,281 | 0 | 0 |
| CIENA CORP | Common equity shares | 171779309 | 60,227 | 3,602,330 | SH | DFND | 1,2,5,6,8,12 | 3,602,330 | 0 | 0 |
| COMPUWARE CORP | Common equity shares | 205638109 | 79,257 | 7,470,533 | SH | DFND | 1,2,5,6,8,12 | 7,470,533 | 0 | 0 |
| CONAGRA FOODS INC | Common equity shares | 205887102 | 741,607 | 22,445,735 | SH | DFND | 1,2,5,6,8,10,12,18 | 22,445,735 | 0 | 0 |
| DANAHER CORP | Common equity shares | 235851102 | 1,910,631 | 25,146,589 | SH | DFND | 1,2,5,6,8,10,12,18 | 25,146,589 | 0 | 0 |
| DARDEN RESTAURANTS INC | Common equity shares | 237194105 | 271,575 | 5,277,525 | SH | DFND | 1,2,5,6,8,10,12,18 | 5,277,525 | 0 | 0 |
| DEAN FOODS CO | Common equity shares | 242370203 | 43,097 | 3,252,639 | SH | DFND | 1,2,5,6,8,12 | 3,252,639 | 0 | 0 |
| DONNELLEY (R R) & SONS CO | Common equity shares | 257867101 | 93,664 | 5,690,363 | SH | DFND | 1,2,5,6,8,12 | 5,690,363 | 0 | 0 |
| EATON CORP PLC | Common equity shares | G29183103 | 1,257,357 | 19,841,636 | SH | DFND | 1,2,5,6,8,10,12,18 | 19,841,636 | 0 | 0 |
| DISH NETWORK CORP | Common equity shares | 25470M109 | 243,422 | 3,769,301 | SH | DFND | 1,2,5,6,8,10,12,18 | 3,769,301 | 0 | 0 |
| ECOLAB INC | Common equity shares | 278865100 | 1,489,703 | 12,973,192 | SH | DFND | 1,2,5,6,8,10,12,18 | 12,973,192 | 0 | 0 |
| FIRSTENERGY CORP | Common equity shares | 337932107 | 1,061,178 | 31,611,055 | SH | DFND | 1,2,5,6,8,10,12,18,19 | 31,611,055 | 0 | 0 |
| FOOT LOCKER INC | Common equity shares | 344849104 | 226,915 | 4,077,501 | SH | DFND | 1,2,5,6,8,12,17,18 | 4,077,501 | 0 | 0 |
| FORD MOTOR CO | Common equity shares | 345370860 | 2,362,183 | 159,714,808 | SH | DFND | 1,2,5,6,8,10,12,18 | 159,714,808 | 0 | 0 |
| INTEL CORP | Common equity shares | 458140100 | 7,321,050 | 210,254,391 | SH | DFND | 1,2,5,6,8,10,12,18,19 | 210,254,391 | 0 | 0 |

6/18/2016 SEC FORM 13-F Information Table

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| INVESCO MORTGAGE CAPITAL INC | Common equity shares | 46131B100 | 44,797 | 2,849,929 SH | DFND | 1,2,5,6,8 | 2,849,929 | 0 | 0 |
| LOGMEIN INC | Common equity shares | 54142L109 | 20,808 | 451,616 SH | DFND | 1,2,5,6,8 | 451,616 | 0 | 0 |
| TERRITORIAL BANCORP INC | Common equity shares | 88145X108 | 3,991 | 196,635 SH | DFND | 1,2,5,6 | 196,635 | 0 | 0 |
| MASONITE INTERNATIONAL CORP | Common equity shares | 575385109 | 25,152 | 454,169 SH | DFND | 1,2,5,6 | 454,169 | 0 | 0 |
| GLOBE SPECIALTY METALS INC | Common equity shares | 37954N206 | 29,792 | 1,637,590 SH | DFND | 1,2,5,6,8 | 1,637,590 | 0 | 0 |
| PENNYMAC MORTGAGE INVEST TR | Closed end mutual fund | 70931T103 | 27,981 | 1,305,834 SH | DFND | 1,2,5,6,8 | 1,305,834 | 0 | 0 |
| ALTISOURCE PORTFOLIO SOLTNS | Common equity shares | L0175J104 | 29,515 | 292,866 SH | DFND | 1,2,5,6,8 | 292,866 | 0 | 0 |
| AVAGO TECHNOLOGIES LTD | Common equity shares | Y0486S104 | 870,940 | 10,010,685 SH | DFND | 1,2,5,6,8,10,12,18 | 10,010,685 | 0 | 0 |
| STARWOOD PROPERTY TRUST INC | Real Estate Investment Trust | 85571B105 | 56,947 | 2,593,168 SH | DFND | 1,2,5,6,8 | 2,593,168 | 0 | 0 |
| CAREFUSION CORP | Common equity shares | 14170T101 | 404,043 | 8,928,913 SH | DFND | 1,2,5,6,8,10,12,17,18 | 8,928,913 | 0 | 0 |
| SPDR WELLS FARGO PREFERRED STOCK ETF | Exchange Traded Product | 78464A292 | 5,906 | 135,740 SH | DFND | 2 | 135,740 | 0 | 0 |
| SPECTRUM BRANDS HOLDINGS INC | Common equity shares | 84763R101 | 20,787 | 229,626 SH | DFND | 1,2,5,6,8 | 229,626 | 0 | 0 |
| APOLLO COMMERCIAL RE FIN INC | Real Estate Investment Trust | 03762U105 | 15,483 | 985,543 SH | DFND | 1,2,5,6,8 | 985,543 | 0 | 0 |
| COLONY FINANCIAL INC | Common equity shares | 19624R106 | 47,111 | 2,105,057 SH | DFND | 1,2,5,6,8 | 2,105,057 | 0 | 0 |
| SELECT MEDICAL HOLDINGS CORP | Common equity shares | 81619Q105 | 18,840 | 1,566,103 SH | DFND | 1,2,5,8 | 1,566,103 | 0 | 0 |
| SHANDA GAMES LTD - ADR | American Depository Receipt | 81941U105 | 452 | 69,143 SH | DFND | 2 | 69,143 | 0 | 0 |
| ECHO GLOBAL LOGISTICS INC | Common equity shares | 27875T101 | 7,040 | 298,965 SH | DFND | 1,2,5 | 298,965 | 0 | 0 |
| EDUCATION MANAGEMENT CORP | Common equity shares | 28140M103 | 577 | 527,913 SH | DFND | 1,2 | 527,913 | 0 | 0 |
| BANCO SANTANDER BRASIL -ADR | American Depository Receipt | 05967A107 | 11,604 | 1,774,307 SH | DFND | 1,2,5,6,8,10 | 1,774,307 | 0 | 0 |
| VERISK ANALYTICS INC | Common equity shares | 92345Y106 | 169,875 | 2,789,929 SH | DFND | 1,2,5,6,8,10,12,18 | 2,789,929 | 0 | 0 |
| MISTRAS GROUP INC | Common equity shares | 60649T107 | 5,545 | 271,746 SH | DFND | 1,2,5,8 | 271,746 | 0 | 0 |
| OMEROS CORP | Common equity shares | 682143102 | 15,754 | 1,238,510 SH | DFND | 1,2,5 | 1,238,510 | 0 | 0 |
| FIBROCELL SCIENCE INC | Common equity shares | 315721209 | 33 | 11,300 SH | DFND | 1 | 11,300 | 0 | 0 |
| ADDUS HOMECARE CORP | Common equity shares | 006739106 | 1,361 | 69,379 SH | DFND | 1,2 | 69,379 | 0 | 0 |
| VITAMIN SHOPPE INC | Common equity shares | 92849E101 | 30,157 | 679,442 SH | DFND | 1,2,5,6,8 | 679,442 | 0 | 0 |
| HYATT HOTELS CORP | Common equity shares | 448579102 | 28,011 | 462,899 SH | DFND | 1,2,5,18 | 462,899 | 0 | 0 |
| STR HOLDINGS INC | Common equity shares | 78478V100 | 38 | 26,208 SH | DFND | 1 | 26,208 | 0 | 0 |
| LEAR CORP | Common equity shares | 521865204 | 90,155 | 1,043,294 SH | DFND | 1,2,5,6,8,12,18 | 1,043,294 | 0 | 0 |
| DOLLAR GENERAL CORP | Common equity shares | 256677105 | 788,996 | 12,911,018 SH | DFND | 1,2,5,6,8,10,12,18 | 12,911,018 | 0 | 0 |
| OI SA | American Depository Receipt | 670851104 | 12 | 17,345 SH | DFND | 2,5 | 17,345 | 0 | 0 |